## McLEOD v. STATE.

[93 South. 928, No. 22421.]

1. HOMICIDE. *Statement made in extremis admissible as dying declaration.*
    Where a person who was fatally shot realized that he was *in extremis,* and was rational, his statement that the accused shot him, and that he did not know what he shot him for, as there had been no cross words between them that day, and that he would not have done a dog that way, is admissible in a prosecution for murder; the proper preliminary proof being made to make the statement a dying declaration.

2. WITNESSES. *Cross-examination of witness for accused as to statements set out in affidavit for continuance held proper.*
    Where a continuance was granted a person accused of murder on account of absent witnesses whose evidence is purported to be set out in the affidavit, the said witnesses appearing and testifying in the trial at a later term to different facts, such witnesses may be examined on cross-examination with reference to the allegations in the affidavit by the defendant as to what he expected to prove by them.

3. CRIMINAL LAW. *Failure to charge on manslaughter where evidence supported murder not error when charge not requested and refused.*
    Under section 793, Code 1906 (section 577, Hemingway's Code), forbidding a circuit judge to grant instructions not requested in writ-

ing by one of the parties to the suit, no error can be assigned for the failure of the trial judge to grant a manslaughter instruction if there is evidence to support murder. In order to assign error in such case for failure to give manslaughter it must be requested and refused.

4. CRIMINAL LAW. *Limiting time for argument not error unless accused prejudiced; where time allowed not consumed no error in limitation.*

   Before an appellant can complain of the limiting of the time for argument in a case it must appear from the record that he was prejudiced by the court's ruling; where the time allowed is not consumed no error in the ruling exists.

5. CRIMINAL LAW. *Conviction not disturbed for improper argument unless bill of exceptions taken at time shows remarks prejudicial.*

   The court on appeal will not reverse a conviction on the ground of improper argument unless a bill of exceptions be taken at the time showing that the remarks were prejudicial.

APPEAL from circuit court of Greene county.

HON. J. D. FATHEREE, Judge.

Hard McLeod was convicted of murder, and he appeals. Affirmed.

*A. F. Moss,* for appellant.

We submit that the alleged dying declarations testified to by Tal McLeod, Robert McLeod and Lee Brown should not have been admitted over the objection of defendant. In the first place, the proper predicate was not laid for the admission of these so-called dying declarations. No doctor or any one else had told deceased that he could not live. In fact, the testimony itself shows that deceased never said that he knew his dissolution was imminent and impending. His statement was that he would never get up, that he could not stand it, and that it was useless to go to this expense. We submit that in neither case was the proper predicate laid to render these so-called dying declarations admissible.

A proper predicate for the admission of a dying declaration must be laid. *Sparks* v. *State,* 113 Miss. 266, 74 So.

123.  Where deceased said that he would never get up, a dying declaration is not admissible.  *Snell* v. *State,* 109 Miss. 744, 69 So. 593.  We submit that this case is directly in point.  At the best dying declarations are intrinsically weak, being a statement of one not sworn and not subject to cross-examination.  *Merrill* v. *State,* 58 Miss. 65.

Before a dying declaration is admissible, the person making the declaration must be *in extermis* and death must be immediate and impending.  *McLean* v. *State,* 12 So. 905.  We submit further that said dying declarations are not admissible because they clearly show that deceased was actuated by malice and desired accused to be punished, because he said that he would not have treated a dog as appellant treated him.  *Reeves* v. *State,* 106 Miss. 885, 64 So. 836.

We further submit that these alleged dying declarations are inadmissible because they do not show that deceased, at the time they were made, had abandoned all nope of recovery.  *Fannie* v. *State,* 101 Miss. 378, 58 So. 2; *Sparks* v. *State, supra.*  The burden is on the state to show beyond a reasonable doubt that the deceased believed in his immediate and impending dissolution, to make his declarations admissible, and we submit that in the present case the state failed entirely to meet this burden.  *McNeil* v. *State,* 115 Miss. 678, 76 So. 625.

In a murder case the question whether declarant realized his condition and whether this declaration was made *in extremis* and should be submitted to the jury is for the trial court, but the weight to be given to the declaration, if admitted in evidence, is for the jury.  *Marley* v. *State,* 109 Miss. 717, 69 So. 210.

We submit that the district attorney in his closing argument should not have used the words: "I had rather go to the penitentiary and stay there and rot than to walk out of this courthouse a free man on the good name of my mother," as shown by special bill of exceptions.  These remarks are not supported by the evidence and have reference to facts entirely without the issue.  There is nothing

in the record to show whether or not appellant's mother had a good name or not. Such remarks could have no other effect than to prejudice the jury against the defendant, and we submit that this case should be reversed on account of such highly improper remarks by said district attorney. *Evans* v. *State,* 98 Miss. 697, 54 So. 154; *Sykes* v. *State,* 89 Miss. 766, 42 So. 875; *Long* v. *State,* 81 Miss. 448, 33 So. 224; *Middleton* v. *State,* 80 Miss. 393, 31 So. 809; *Collins* v. *State,* 99 Miss. 52, 54 So. 666.

We also submit that the court erred in limiting the argument of this case to one hour on each side as shown by special bill of exceptions shown on page 283 of the record. There were two attorneys for the defendant in this case as shown by the record, and the testimony was voluminous, there being twelve witnesses for the state offered on the direct proof, thirteen witnesses for the defendant and six witnesses introduced by the state in rebuttal. It is true, as certified by the trial judge, that the attorneys for defendant did not use all of the hour allotted to them in this case, but the writer of this brief was one of these attorneys and on account of the time fixed by the court, the writer in that case did not attempt to sum up the testimony as he would have done had he been given more time. For that reason a large part of the argument that the writer intended and desired to make was necessarily dispensed with on account of this arbitrary ruling of the court, which, we submit, is contrary to the ruling of this court announced by this court in the case of *Wingo* v. *State,* 62 Miss. 311, expressly overruling the old rule laid down in the case of *Lee* v. *State,* 51 Miss. 566. The court will note that in the Wingo case there were only seven witnesses for the state and five for the accused, that two attorneys represented the defendant, and the lower court limited their argument to one hour, which was held by this court to be reversible error.

We submit that the evidence in this case shows that the killing was done in the heat of passion and was not murder, and hence the court erred in charging as to murder. *Stag-*

*ger* v. *State,* 110 Miss. 557, 70 So. 690; *Pigott* v. *State,* 107 Miss. 552, 65 So. 583. The evidence in this case, and even the confession of defendant testified to by other witnesses, showed that this killing was done in the heat of passion, and only issues of selfdefense or manslaughter were raised. A conviction of murder on evidence which raises only issues of self-defense or manslaughter will be reversed. *Jones* v. *State,* 98 Miss. 899, 54 So. 724.

Where the evidence in the prosecution for homicide does not warrant conviction of a greater offense than manslaughter, the court must instruct as to manslaughter though not requested so to do. *May* v. *State,* 89 Miss. 291, 42 So. 164; *Johnson* v. *State,* 23 So. 579; *McDonald* v. *State,* 78 Miss. 369, 29 So. 171; *Gamlin* v. *State,* 29 So. 764.

The defendant in this case requested the lower court to charge the jury to find him not guilty of murder, but this the lower court refused to do. We submit that the defendant in this case was justified in said shooting on the ground of self defense, but if we be mistaken in this, we submit that the evidence shows conclusively that he could have been guilty of manslaughter only, and we think this case comes squarely under the ruling in the late case of *Williams* v. *State,* 90 So. 705. Therefore, we respectfully submit that the judgment of the lower court ought to be reversed.

*W. C. Churchwell,* for appellant.

The principles under which dying declarations may be admitted in evidence, was cited by our supreme court in *Bell* v. *State,* 72 Miss. 507, 17 So. 232. The authorities all agree that to make a dying declaration competent it must be made "under the realization and solemn sense of impending death." *Bell* v. *State,* 72 Miss. 507, 17 So. 232; *Fannie* v. *State,* 101 Miss. 378, 58 So. 2; *Reeves* v. *State,* 106 Miss. 885, 64 So. 836; *Sparks* v. *State,* 11 Miss. 266, 74 So. 123; *Ashley* v. *State,* 37 So. 960; *Guest* v. *State,* 96 Miss. 871, 52 So. 211.

In *McNeal* v. *State,* 115 Miss. 678, 76 So. 625, the court said: "The burden is on the state to show the court beyond a reasonable doubt that the deceased believed in his immediate and impending dissolution, to make his declaration admissible, and where deceased says nothing about impending death, but prays to the Lord 'Who has helped him before,' his declarations are inadmissible." *Snell* v. *State,* 109 Miss. 744, 69 So. 593.

We next think the lower court committed reversible error in permitting the state to introduce the affidavit of Hard McLeod, which had been made for the purpose of securing a continuance at the former term. Section 26, of the constitution, says: "That the defendant shall not be compelled to give evidence against himself." Defendant had the right to ask for a continuance and to give his reasons therefor; in fact he was compelled to ask for this continuance or go to trial unprepared. The reasons given in the affidavit are sufficient to grant the continuance, and this was the only available remedy for defendant to get time in which to get his witnesses and become ready for trial. This affidavit was introduced twice during the trial. It was first introduced as exhibit to the testimony of Byron McLeod who was the absent witness, and who the affidavit was made to secure as a witness in behalf of defendant. He knew nothing about the facts set out in the affidavit and had no reason to know, for it was not made by him, but to secure him as a witness in the cause, and was improperly introduced to his testimony. The next introduction of this affidavit was an exhibit to the testimony of John Colbert, circuit clerk, and read into the record in full in the presence of the jury as before. The defendant was not used as a witness in his own behalf, and therefore the testimony was not competent against him. This is an effort to compel the defendant to testify against himself which is unconstitutional. The defendant has the right to testify in his own behalf, but when he does not do so, he cannot be compelled to testify against himself. And since he was forced to make the affidavit to get time to have his witness

brought into court the use of this affidavit against him on the trial, when defendant did not testify was a rash violation of legal and constitutional rights guaranteed to the accused.

We also except to the remarks made by the district attorney in his closing argument to the jury which we make in the special bill of exceptions as shown by the record, where the prosecuting council uses the following language, to-wit: "I had rather go to the penitentiary and stay there and rot than to walk out of this courthouse a free man on the good name of my mother." *Sykes* v. *State*, 89 Miss. 766, 42 So. 875.

We next contend that the lower court committed error in not allowing council for appellant more than one hour in which to argue his case when appellant's council requested one and one-half hours in which to argue this cause as shown by special bill of exceptions. *Wingo* v. *State*, 62 Miss. 311. The next and last point we wish to call the court's attention to is, the lower court erred in overruling defendant's motion for a new trial for the reason that the verdict was contrary to the evidence, which was assigned as error on motion for a new trial, and further assigned as error on this appeal.

*H. Cassedy Holden,* assistant attorney-general, for the state.

The appellant contends that the court erred in admitting the dying declaration of the deceased. It is insisted that the statement of the deceased was inadmissible because not made under an impending sense of dissolution. But the evidence shows, as set forth in the statement of facts, herein, (1) that the deceased had at no time expressed any hope whatever of recovery; (2) that he was suffering intensely from a wound; (3) that he stated to one witness that he could not get well, to another that there was no chance for him; (4) that he told Lee Brown "There was no chance in the world for him." These circumstances and

statements show clearly and conclusively that the deceased knew that he was going to die in a very short time. He did die about twenty-four hours after he was shot. From the time that he was shot until the time of his death, he suffered severe pain except while under the influence of opiates. He coughed and spat blood constantly and at no time was there the least indication that he believed he would get better or get well.

The appellant relies on *Bell* v. *State*, 72 Miss. 507, 17 So. 232. In that case the deceased was struck on the head with an axe. He was not even knocked unconscious and said nothing about his condition until the next day, when he asked another about buying some meat on credit. On the night when he was struck he made the remark that Bell had almost killed him. The deceased didn't even have a physician, nor were his wounds examined by anyone and their gravity explained to him. He said nothing about dying until the next day, when he told his wife that he would die in a few days. Obviously, the declarations of the deceased under such circumstances were inadmissible.

The appellant relies on *Fannie* v. *State*, 101 Miss. 378, 58 So. 2. In the Fannie case the court said: "All that this evidence can be said to prove is that deceased realized that he was bleeding to such an extent that he would die if the flow of blood was not quickly checked. If this could have been done, he probably would have recovered. It was for this purpose that he was urging his mother and friends to make haste and find a doctor, and there is nothing in this evidence from which it can be said that he did not think that the doctor would be found in time to stop, and who when found, would in fact succeed in stopping the flow of blood. It cannot be said, therefore, that the defendant abandoned all hopes of recovery. " The deceased in that case was shot in the neck.

Appellant relies on *Reeves* v. *State*, 106 Miss. 885, 64 So. 836. In that case the deceased died from blood poisoning resulting from a gunshot wound, just above the right knee. The deceased made two declarations. The first was made

to the physician, who had told the deceased that he was going to die. But the evidence did not show that the deceased expected to die, nor did he state at any time that he was going to die while he was talking to the physician, or before that time. The second declaration was made to a witness and was in part as follows: "Yes, sir; he says, Barney has murdered me, and I hope the people won't let Barney walk about and do nothing to him after he has murdered me like he has."

This court held that both of the above declarations were inadmissible; the first, because not made under a sense of impending dissolution; the second, because it was obviously inspired by malice and hatred. The appellant relies on *Sparks* v. *State*, 113 Miss. 266, 74 So. 123. In the Sparks case the declarant merely cried out to his antagonist not to shoot him any more as he had already killed him, and subsequently the alleged dying declaration was made. The declarant at no time said that he was going to die, or showed any other evidence that he expected to die immediately.

The appellant relies on *Ashley* v. *State*, 37 So. 960. The court said in that case: "The dying declaration was improperly admitted. A careful examination of the record fails to disclose any specific proof that it was made by the declarant when resting under an abiding sense of impending dissolution."

The appellant relies on *McNeal* v. *State*, 115 Miss. 678, 76 So. 625. In the McNeal case there were two declarations. The declarant first said that defendant shot him without cause. The court held that this statement was not a mere expression of opinion, but was admissible as a dying declaration. The declarant next said: "I wont be with you much longer, I have got to leave you; O! Lord! what a pity for Frank McNeal to shoot a poor boy like I am for nothing. I never done anything to Frank." The court held that this was a mere exclamation of pity and not admissible as a dying declaration. As to the first declaration, the court held that it was not competent because

not made under a sense of impending dissolution, because up to the time of the declaration the declarant had said nothing about dying or expecting to die. The court held the second declaration to be incompetent because it was a mere expression of pity.

The appellant relies on *Snell* v. *State,* 109 Miss. 744, 69 So. 593. In the Snell case the deceased lived over nine days after he was shot. He said nothing about dying, but merely said that he would never get up from his bed. Moreover, his physician told him that it was doubtful as to the outcome of the injury, but never told him that he was going to die.

The foregoing cases, together with the late case of *Ealy* v. *State,* 91 So. 417, announce the law in this state as to the competency and admissibility of dying declarations. The state has no argument to make against these cases, nor any complaint against the rule which they announce. But each case must stand upon its own facts and circumstances. The situation surrounding a man shot by another is never quite the same as in similar situations. The facts vary and it is for the trial court to determine the competency and admissibility of a declaration in each case. In the case at bar the evidence was amply sufficient to show that the deceased had no hope of recovery, but on the other hand expressed himself as being certain of death. He even tried to persuade his relatives to let him die there on the spot and avoid the expense of taking him to a hospital or resorting to other elaborate means of saving his life. He said that there was no use in doing anything.

So far as the question of the deceased's consciousness of immediate death was concerned, the evidence is clear that the declaration was not inadmissible or incompetent because of the absence of such feeling. Whether or not the declaration of the deceased was a mere expression of pity or malice is for this court to determine in the light of *McNeal* v. *State, supra; Payne* v. *State,* 61 Miss. 161; *Powers* v. *State,* 74 Miss. 777, 21 So. 657, and *Jackson* v. *State,* 94 Miss. 83, 47 So. 502.

Conceding, for the purpose of argument, that the dying declaration was improperly admitted, it is not reversible error, because there is other competent and sufficient evidence to justify the verdict. According to the defendant's own witnesses, the defendant shot and killed the deceased without any provocation whatever, deliberately and with studied malice. The deceased was shot in the back. There are no possible circumstances which would, under the law, justify the shooting of an unarmed man in the back. The error, if any, in admitting the dying declaration, was not prejudicial and will not cause a reversal. *Fletcher* v. *State,* 60 Miss. 675; *Penn* v. *State,* 62 Miss. 450; *Moore* v. *State,* 86 Miss. 160, 30 So. 504.

Admission of Affidavit. The appellant complains of the action of the lower court in permitting the state to introduce the affidavit for continuance made out by the defendant. The witness, Barron McLeod, was asked about this affidavit on cross-examination. See record pp. 231 to 234. This witness had testified that the mother of defendant was not at the house when the shooting occurred; but the affidavit alleged that the defendant could prove by Byron McLeod, an absent witness, that the deceased was cursing and attempting to kill defendant's mother at the time he was shot. The affidavit was read to the witness, Byron McLeod, after which he tried to change his testimony and say that the deceased had started at his mother with a knife. In other words, by means of the affidavit, the district attorney caught this witness in a lie, thus impeaching him and destroying his credibility as a witness for the defense. The affidavit itself was not at that time offered in evidence, although the defendant objected to the introduction of the evidence and the court reserved its ruling. See record page 231. Later, the state offered the affidavit in evidence and the objection of the defendant thereto was sustained by the court. See record page 250.

The appellant cannot complain of the introduction in evidence of the affidavit, because it was not introduced in evidence. It was merely used for purposes of cross-examin-

ation and when offered in evidence it was excluded. Moreover, it was admissible in evidence as a part of the record in the case. The pleadings in a case are a part of the case and it is difficult to see how any objection could be made to reading any or all of the pleadings to the jury.

*Remarks of Counsel.* The appellant next complains of the language of the district attorney, which was as follows: "I had rather go to the penitentiary and stay there and rot than to walk out of this courthouse a free man on the good name of my mother." There was nothing wrong with this argument. It was based squarely on the evidence in the case.

*Manslaughter Instruction.* No manslaughter instruction was given by the court because no such instruction was requested by either party to the case. The trial court cannot give manslaughter instructions of its own motion. *Johnson* v. *State,* 78 Miss. 627, 29 So. 515. The appellant complains of the action of the lower court in limiting the argument of counsel. Counsel were allowed one hour to the side. This was ample time, and the action of the court in so limiting the argument, cannot work a reversal in this case. The length of time allowed for an argument of a case is solely within the discretion of the trial court, and there is no showing in this record that such discretion was abused or that the limitation of one hour to the side worked any injury or prejudice to the appellant.

Cook, J., delivered the opinion of the court.

The appellant was indicted, tried, and convicted for the murder of Charlie McLeod, his first cousin, and sentenced to imprisonment for life in the state penitentiary.

The evidence shows that on the morning of the killing the appellant and the deceased were at Sunday school in a church in the neighborhood; that the appellant was drunk at Sunday school, and dropped his pistol from his pocket. At the conclusion of the services the appellant invited the deceased to go home with him for dinner. Ap-

pellant's sister was at church, and the deceased told her to go ahead, that he would look after Hard. They left the church arm in arm and went to the residence of the appellant, who lived with his father, and the shooting took place at the appellant's home. The first witness for the state who arrived at the home of the appellant after the shooting testified that the appellant was not there, and that the deceased was lying on the kitchen gallery begging some one to go for the doctor. The doctor was sent for, and came and took the deceased in his car to a hospital in Mobile, Ala., for an operation, and the deceased died in Mobile the following day, about the same time of day that he was shot, living about twenty-four hours after being shot. The deceased prior to his death made certain dying declarations to his brother on the way to Mobile, and to one of his brothers and his brother-in-law at the hospital. The first dying declaration testified to is as follows:

"Q. What statement, if any, did he make to you about whether or not he was going to die or get well? A. He told me there was no use to go to any great expense, for he could not get over it.

"Q. Where did he tell you that, A. On the way to Mobile.

"Q. After he made that statement to you, did he make any statement to you about the killing? A. Yes, sir; he said he did not see why in the world Hard went and shot him for, because there had not been a cross word between them all day."

The second statement was made in the hospital to the brother and brother-in-law. The brother testified as follows:

"Q. While you were there with him the next day, did he have anything to say about whether or not he would live or get well? A. He told me, he said, 'There is no chance for me.'

"Q. He told you that? A. Yes, sir; he said, 'Robert, there is no chance for me.' He said, 'I don't see how in the world come Hard to do that.'

"Q. Do what? A. He said, 'I don't see how in the world come Hard to do that; I would not have done a dog that way.'

"Q. What was he talking about? A. About being shot."

His brother-in-law, Lee Brown, testified as follows:

"Q. Did he make a statement to you at that time about whether or not he would live or get well? A. Yes, sir; he made a statement. He said that he could not get well; there was no chance in the world for him. He said that he would not live; that there was no chance in the world for him.

"Q. Did you ever hear him express any hope of getting well? A. No, sir; not a bit.

"Q. And you were with him from the time you carried him to Mobile until he died? A. Yes, sir.

"Q. I will ask you to state what statement, if any, he made in your presence after he made the statement that he had no hopes of getting well, about the shooting, who shot him, and why? A. He said that Hard McLeod shot him. I said, Charley, what did he shoot you for, and he said that he did not know; that there was no cross word between us there, and there had not been that day. I said, 'Was you mad with him, or was he mad with you,' and he said, 'Not a particle in the world. I was not mad with him, and if he was mad with me I didn't know it.' "

The sheriff of the county testified for the state that he went out to the home of appellant where the shooting took place, and that when he arrived appellant was not in the house, but that he found him in the woods drunk and carried him to jail that afternoon, and that in a conversation in which the sheriff asked him why he shot the deceased he stated that he did not shoot him; that the deceased shot himself; that on the following morning, in a conversation with appellant in reference to why he did the shooting, the appellant stated that he shot him because he was cursing and abusing his mother, and that he had forbidden him to come in the house, and that he shot him to protect his mother.

The defendant produced two witnesses who testified in reference to the shooting, one his brother, and the other a witness by the name of Lambert.  These witnesses stated that they passed the appellant and the deceased on the day on which the shooting occurred a short distance before reaching the home of the deceased, and that they were sitting on the roadside quarreling and trying to fight; that deceased had his knife open, and appellant and deceased got up to fight, and the deceased stuck his knife in his pocket open, when they went on and left them, going on to the home of the appellant, who lived with his father; that in a short time appellant and deceased came on to the house quarreling and cursing; that the deceased was cursing appellant's mother, and threatening her; that when she saw them coming they asked appellant's mother to leave, and she went to an uncle of appellant who lived near by; that when they got to the house appellant forbade the deceased to come in, but that he came in, still cursing and abusing the appellant and his mother, and after they got into the house that deceased tried to fight the appellant, and turned to pick up a chair, when the appellant shot him. These witnesses were corroborated by a sister of appellant, who heard the cursing, or claimed to have done so, but did not see the shooting.  These witnesses were contradicted by statements made to other parties, in which contradictory statements were made similar to statements made by the sheriff above set out.

There was much proof for the defendant that' the deceased was a man whose reputation for peace and violence was bad in the community, and also that he had threatened the appellant on previous occasions, and that on one occasion, about a year before the deceased and his brother had assaulted appellant and threatened his life.  The state introduced much proof to counteract the evidence of a bad reputation for peace, a large number of people testifying that the deceased's reputation in that respect was good.

At the term of court at which the appellant was indicted the witness Lambert and a brother of appellant were not

present, and an application for a continuance was made in which it was stated on oath by the appellant that he expected to prove by them that the deceased was assaulting his mother and cursing her at the time of the shooting and that the shooting was in defense of his mother. When these witnesses were on the stand the state examined them with reference to the truthfulness of the statements therein set out, and they stated that the statements therein made were not true as therein made. At the conclusion of the evidence the court limited the argument to one hour to each side, over the objection of the appellant, but the attorneys for the appellant did not consume the one hour allotted. In the argument of the district attorney he stated:

"I had rather go to the pen and stay there and rot, than to walk out of this courthouse a free man on the good name of my mother."

The appellant assigns for error the admission of the dying declaration above set out; the reading of the affidavit for a continuance to the witnesses, and interrogating them with reference to the truthfulness of the statements in the affidavit; that the court erred in not giving a manslaughter instruction on its own motion, neither the state nor the defendant having asked for such an instruction; that the court erred in limiting the argument to one hour to each side; that it was error for the district attorney to make the statement above set out in his argument; and the refusal of the court to grant the defendant a peremptory instruction when the state concluded its evidence, also when the whole evidence was in.

We think the dying declaration above set out was competent, and that it came within the rules announced by this court in the various decisions dealing with that subject. We deem it unnecessary to discuss the numerous authorities cited on this proposition in the appellant's brief. We think the rules governing that subject are clearly and correctly stated in *Bell* v. *State*, 72 Miss. 507, 17 So. 232, and that the proof in this case was such as authorized the trial judge to believe beyond a reasonable doubt that the dec-

laration was made in conformity to the law therein announced.

We do not think it was error to cross-examine the witnesses Lambert and McLeod with reference to statements which the appellant expected to prove by them shown in his affidavit for a continuance at a former term.

It is claimed that the court erred in not giving a manslaughter instruction, although neither the state nor the defendant requested such an instruction. Under section 793, Code 1906 (section 577, Hemingway's Code), the circuit judge is prohibited from giving any instruction of his own motion, but can only give such instructions at the request of the parties. This is not a case where the instruction given for the state precludes a finding of manslaughter. The instruction in the present case on the form of the verdict tells the jury that, if you find the defendant guilty of murder, you may return one of the following verdicts, setting out therein the different forms of verdict for murder, and also tells the jury that, if they find the defendant not guilty, they will render a verdict, "We, the jury, find the defendant not guilty as charged," and in that event the court will discharge the defendant. There is nothing in this instruction that precludes the jury from finding a verdict of manslaughter. This court has on numerous occasions announced that the judge was without power to grant an instruction when it was not asked for by one of the parties. In *Davenport* v. *State,* 121 Miss. 549, 83 So. 738, this court held that, under section 793, Code 1906 (section 577, Hemingway's Code), the trial judge is forbidden to give an instruction not requested by either party, and reversed a conviction because the court did so. In *Johnson* v. *State,* 106 Miss. 94, 63 So. 338, it was held that, on the trial of an accused for murder, he cannot complain that the court did not instruct on manslaughter where the appellant presented no instruction thereon, as the court cannot grant instructions unless they are in writing and requested to be given. In *Dixon* v. *State,* 106 Miss. 697, 64 So. 468, it was held by this court that under this section

the court cannot grant instructions not asked for, and the failure of the court to give an instruction defining murder when neither party requested it is not error. To the same effect are *Pringle* v. *State,* 108 Miss. 802, 67 So. 455; *Watkins* v. *State,* 60 Miss. 323; *Boykin* v. *State,* 86 Miss. 481, 38 So. 725.

In the present case there is ample evidence to warrant the jury in believing that the appellant was guilty of murder, and the principle of *Staiger* v. *State,* 110 Miss. 557, 70 So. 690, and *Pigott* v. *State,* 107 Miss. 552, 65 So. 583, and other cases announcing the same doctrine, is not applicable. Of course, if there was no evidence to warrant a conviction of murder, it would be error to grant an instruction on murder where a conviction of murder followed.

There was no error in the court limiting the argument to one hour to each side because the record shows that the hour allowed was not consumed in the argument by the defendant. Before appellant can complain of the limiting of the argument it must appear from the record that he was prejudiced by the court's ruling.

The bill of exceptions with reference to the argument of the district attorney, as above stated, is insufficient to show any abuse of the privilege of advocacy. The evidence showed that the appellant was claiming to have acted in defense of his mother, and that the deceased called her very vile names, and there is much evidence tending to show that such a theory was false in fact. The connection in which the statement made in the argument of the district attorney does not sufficiently appear, and therefore this assignment is without merit.

The judgment of the court will therefore be affirmed.

*Affirmed.*