BLACKWELL *v.* STATE.

(Division B. June 8, 1931.)

[135 So. 192. No. 29496.]

Logan & Barbee, of Hernando, for appellant.

**W. A. Shipman,** Assistant Attorney-General, for the state.

Argued orally by **J. W. Barbee**, for appellant, and by **W. A. Shipman**, Assistant Attorney-General, for the state.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant was indicted, tried, and convicted in the circuit court of De Soto county for the murder of one W. C. Belote, and was sentenced to life imprisonment in the state penitentiary. The killing occurred on the 8th of April, 1930, and both the appellant and the deceased lived at Lakeview in said county.

It appears from the testimony that Belote, the deceased, had directed a negro to bring some lumber from the bank of the lake up to the store of Belote not far distant from the lake, and that the negro .reported that Blackwell ordered him not to carry the lumber, and that thereupon Belote stated that he would get the lumber himself and he went down to the lake where the

appellant then was. Shortly after this happened a shot was fired, and the wife of the deceased and a man by the named of Clark ran down to where the shooting occurred and found Belote lying in the roadway, shot in the mouth, neck, and breast. According to the witness Clark, about this time the appellant came out of a shack or room occupied by him, with a shotgun and went north into the woods. Mrs. Belote made some statement to Blackwell about the killing of Belote, or the shooting of him, and the appellant stated: ''I had enough to kill him for— God damn him,'' and went on. Belote was put in a conveyance and carried to Memphis, but died shortly after reaching the hospital, one of the shots having punctured or severed the jugular vein.

Another witness who claimed to be an eyewitness to the shooting testified that he had come to Lakeview to investigate the fishing, and that when he reached the depot he heard some talking down at the lake, and that he went down there, and Blackwell and Belote were having some words, but when he came up the words ceased; that Belote directed a negro to take a piece of lumber up to the store; that Blackwell had gone ahead of the negro to a place occupied by him, and as the negro came by with the piece of lumber Blackwell stated to the negro, ''Negro, drop that board,'' and that Belote directed the negro to take the lumber up and carry it on, stating that he was behind him. This witness also stated that when Blackwell left where Belote was standing, starting in the direction of his room, Belote stated to him that he better not bring that gun out, or words to that effect, and if he did that he would hurt him. The witness further stated that Belote went on behind the negro, and as he reached the point where he was shot Blackwell came out with a gun and took deliberate aim at Belote; that Belote was not doing anything and did not have anything in his hands, but was merely looking at the ap-

pellant, Blackwell, at the time he fired the shot. He stated that after Blackwell fired the shot he returned to his room, and that he (the witness) stepped up near the room and saw him reloading his gun, and, when he did this, the witness ran away and tried to find a gun or pistol with which to arrest Blackwell.

The sheriff was notified of the killing, and about forty minutes later his deputy arrived at Lakeview, and either the deputy or Mr. Woods, the witness above referred to, went into the woods and found the appellant, Blackwell, in an intoxicated condition and, arrested him, and he was placed in jail.

On the trial, Blackwell, the appellant, testified that Belote came down to the lake where he was in reference to the lumber, and that he (Blackwell) had told the negro not to get the lumber, that it belonged to Blackwell and not to Belote, and that he needed all the lumber he had; that Belote accused Blackwell of having charged him with selling beer and called him vile names and struck him with a hatchet on the back of the head, having thrown the hatchet at him, and knocked him against a boat which injured his side, and that he got out of the mud and water where he was standing and ran to the house where, he lived, all the while being pursued by Belote, who still had a hatchet, and that at the instant the shot was fired Belote had started to throw the hatchet at him again. Blackwell also stated that when Belote fell he went and picked up the hatchet and carried it to the rear of his room and either left it there or threw it in the weeds, that he does not know where the hatchet is or whether it remains there or not, and that he did not tell any person about where the hatchet was or where he had placed it until the trial.

The witness Woods was shown to have been a transient person who had been at a good many different places and had been arrested a good many different times. This testimony was developed by Woods' testimony on cross-

examination principally, and does not show that he was convicted of many of the offenses arrested for, although he was convicted of some of them. A former sheriff of one of the counties in Missouri where the witness Woods had formerly lived, but from which he had been absent about ten years, testified that Woods' reputation for veracity in that county was not good. It appears from examination of Woods that he had formerly been in the Army and had deserted, but that during the World War he re-enlisted in the army and saw service overseas, being in a number of battles, including Chateau Thierry and the Argonne, and that he was honorably discharged from the army.

It is argued that the evidence is insufficient to sustain a conviction, and that the witness Woods is unworthy of belief and his testimony is insufficient. There seems to have been no objection to the introduction of evidence affecting Woods' credibility, although Woods had been away from the community some ten years. It was for the jury upon the whole evidence to determine the credibility of Woods' testimony in connection with the other testimony in the case. Taking Woods' testimony and the other facts stated, especially Blackwell's statement to Mrs. Belote in which he used the language above set out indicating malice or hostility towards the deceased, we think the proof is ample to sustain a conviction.

While the district attorney was making his argument, exception was taken to statements made in the argument. The statements set out in the bill of exceptions which were objected to and excepted to are as follows: "I don't blame the defendant for testifying as he did in this case. If I were on trial for my life I would hold up my hand and swear to anything to save my own life;" and: "If you don't believe it was necessary for Blackwell to kill Belote to save his own life then you must find the defendant guilty as charged." He repeated these statements

several times over objection, and the objection was overruled, and he further stated, "Do you blame the defendant for coming on the witness stand and swearing a lie and committing perjury to save his life—I would do it myself," and again, "I don't blame the defendant for swearing as he did, if I was on trial for my life I would swear as he did." This argument is vigorously assailed and is the principal thing relied upon for a reversal of the judgment. It will be noted from the statement that a very brief part of the argument was singled out for exception. It is difficult from the brief statement of the argument to tell its setting in the argument as a whole, or its relation to the argument of the attorney for the appellant in the trial.

In Carter v. State, 140 Miss. 265, 105 So. 514, 515, we held in the seventh syllabus: "Where statements of a prosecuting attorney are objected to, a sufficient amount of the language should be set out in the bill of exceptions to show the court the context in which the language was used, so that the real meaning of the language may be judged by the context." At page 278 of the Mississippi Report (105 So. 514, 517), in discussing objections to the argument of the district attorney in that case, the court said: "It is next insisted that the district attorney said, 'If you don't believe all she said (referring to appellant's wife) you have a right to disbelieve all; if you don't believe a part, you can disbelieve all.'" It was for the jury to decide whether they would believe all that the witness said and if she were worthy of credit. The jury was not authorized, of course, to disregard all of the testimony of the witness for the sole reason that they did not be-believe a part of it. To authorize them to disregard all of it because a part is false requires a belief that the falsity was knowingly and corruptly testified to. The statement is not elaborate enough or full enough for us to know its full effect. It is not permissible to single out

sentences disconnected with the context, and, where objection is taken to statements, enough of the context ought to be embraced in the bill of exceptions to enable the court to know what a fair construction of the statement would mean.''

In McLeod v. State, 130 Miss. 83, 92 So. 828, 831, the court referred to the same matter, saying: ''The bill of exceptions with reference to the argument of the district attorney, as above stated, is insufficient to show any abuse of the privilege of advocacy. The evidence showed that the appellant was claiming to have acted in defense of his mother, and that the deceased called her very vile names, and there is much evidence tending to show that such a theory was false in fact. The connection in which the statement made in the argument of the district attorney does not sufficiently appear, and therefore this assignment is without merit.''

In the recent case of Nelms & Blum Co. v. Fink, 131 So. 817, 820, we discussed the advantages that the trial court has over this court in judging the propriety of statements made in argument by the attorneys. As the trial judge hears all of the arguments on both sides and knows from the course of the argument the setting of the particular language excepted to and what relation it had to the rest of the argument made by the attorney or to the argument made by opposing attorneys, he has a much greater advantage in determining whether it is proper or not than has this court. We said in the case last mentioned: ''It is always a difficult matter, as well as a delicate one, to determine whether there has been an abuse of the privilege of advocacy in the argument of the causes, except in few cases where it is so palpably evident that the case has been prejudiced by a statement of facts not in evidence or by gross invectives and abuse, and we do not have the advantage that the trial judge has of hearing the argument as a whole. The trial judge

has a peculiar and distinct advantage of the judges of this court in judging upon such questions, because he is not only familiar with the evidence and the atmosphere of the case, as it may be called, but he has heard the entire argument and knows the setting that the language complained of has in connection with the argument on both sides of a case."

In Gray v. State, 90 Miss. 235, 43 So. 289, 290, the court dealt with statements made and arguments, and discussed the question fully and eloquently. In that case the prosecuting attorney said: " 'He is as guilty as he can be;' 'called him a bloody assassin;' 'that he said that the appellant was an athlete, and sprang to his feet, and shot Newt Wallace in the back of the head while he was standing, and then shot Felix Jones straight through from the front while he was standing, the ball going through him;' that he said 'that the defendant murdered Newt Wallace in cold blood, and that he called on the jury whether they will put a stop to these homicides, and that there had been three or four in his neighborhood within the last few months, committed by negroes;' and 'that the proof in the case in the justice's court showed that the defendant had not lived with his wife for two and one-half years or more,' etc." The court said, in reference thereto: "So far as the observation about his not having lived with his wife for two and one-half years is concerned, the testimony in this record shows that that was true. It is also true that Jones was shot in the same difficulty. So far as the expression of opinion of the learned counsel that the defendant was guilty is concerned, he certainly had the right to state his opinion from the evidence." After discussing the right of argument on the facts which were brought in the evidence, the court had the following to say with reference to the effect upon the jury: "The frequency with which these assignments of error recur would seem to indicate that

the learned counsel who represent defendant have forgotten that the twelve men who sit in the jury box represent the average intelligence and the average integrity of the counties from which they respectively serve. Most surely, if the laws with regard to the selection of juries have been themselves honestly and intelligently followed, juries do always represent the average intelligence and the average integrity of their counties. They do not sit as dummies in the jury box. They are to be dealt with by the judge of the lower court and by this court as men who appreciate and understand the oaths which they took as jury men, as men having and exercising average intelligence and average integrity, capable mentally of understanding the written instructions of the court and the argument of counsel, and capable morally of having the courage and firmness to draw their own conclusions for themselves from the law as written and from the testimony as delivered, without reference to improper appeals from counsel on either side. The administration of justice is a pre-eminently practical thing.''

In Bufkin v. State, 134 Miss. 116, 98 So. 455, 457, we were called upon to decide the effect of arguments made by attorneys in reference to the interest that the appellant had in the result of the trial. We said: ''It is next argued that the prosecuting attorney commented upon the evidence of the defendant, and stated to the jury that the appellant's interest in the result of the trial was greater than the state's witnesses; that he had a direct personal interest in the case, in that he would be sent to prison if convicted. To which argument exception was taken, but the court refused to sustain objection to this. We think it is within the privileges of the attorneys to comment upon the evidence. The very purpose of argument is to suggest conclusions that may be drawn from the evidence, which might not occur to the jury without argument, and, while the court cannot single out the defendant's evidence by instruction and comment

thereon, this does not apply to the attorneys in the case. They have the privilege of commenting on the evidence and drawing inferences or deductions therefrom, and may refer to the witnesses by name. And in our opinion no error was committed in making said argument.''

In the case of Nelms & Blum Co. v. Fink, supra, we discussed the right of counsel in making an argument to the jury, and pointed out that he could comment upon any evidence introduced from the witness stand and upon any fact of which the court would take judicial knowledge, that his argument did not have to be sound or his conclusions sound., We dressed this opinion in rhetorical evening clothes with the hope that the attention of counsel making objections to argument of other counsel would look to the previous decisions of this court and recognize the broad field of advocacy and difficulty of judges undertaking to control counsel in regard thereto, and the character of objections that would be acted upon in this court.

Taking the bill of exceptions in the case before us in the light of the evidence in the case, it is manifest that the district attorney was drawing a deduction from the testimony that the defendant's evidence was false, and that he was calling attention to the motives that the defendant had in regard thereto. He was within the field of permissible argument so far as he commented upon the truthfulness or falsity of the defendant's evidence in this case. There was ample foundation in the testimony for comment of this character. The attorney can draw deductions and make arguments suggesting the falsity or truthfulness of the evidence in the case. It is one of the necessary functions of advocacy in the case of conflicting evidence. We cannot therefore reverse the case for the argument made. We do not mean that we approve of all that was said. Indeed we must condemn the part of the statement which said, ''Do you blame the defendant for coming on the witness stand and

swearing a lie and committing perjury to save his life —I would do it myself.'' While this comment is not reversible error and is palliative rather than condemnatory of perjury, we regret that the statement was made, and hope that it was the ebullition arising in the heat of argument and not the attitude of the law-enforcing officer of the state. The law does not justify perjury in any case, although a man may be swearing with the issue of his own life at stake. When he takes the witness stand he is under legal obligation to tell the truth, and, if he willfully and corruptly testifies falsely, he may be indicted and punished for so doing, although his own life was an issue in the case. The punishment for perjury is by imprisonment in the penitentiary, Code of 1930, sections 1083-1085. The definition of perjury is contained in section 1082 of the same Code. Not only is it a felony, but it operates in law as a permanent disqualification of the witness in a court of justice forever thereafter. Of all the crimes denounced in the Code, it alone carries with it, in addition to the infamy attached to ordinary felonies, the further infamy of disqualification from testifying afterwards in court. It is true there must be a conviction in legal and due form before the severe disqualification attaches, but when a person has been convicted he may not thereafter testify in court in any cause, although the life of his father and mother, or brother, or sister, or wife, or children, might be at stake. He could not be produced to give evidence, although his evidence might exculpate them. The law, therefore, has visited upon perjury extreme odium; it is the vilest sin in the code of crime. The Legislature deemed it so vile and so hurtful that it provided that after a conviction therefor such person should never be heard again so far as the courts were concerned; it also undertook to provide that a pardon of the crime of perjury should not restore the witness to competency. Whether that limitation upon the pardoning power is

valid or not is no concern here, but it is the deliberate judgment of the people acting through their elected representatives that perjury is so disastrous and so unpardonable that one convicted of it can never thereafter be used as a witness. As the law so severely condemns it and visited it with such odium, it does not warrant officers of the law and ministers of justice in palliating or excusing it.

Perjury is one of the greatest evils that afflicts the country today. It is the cankerworm gnawing at the heart of justice. It is a moral reptile whose venom is more deadly to the administration of law and justice than the venom of the worm of the Nile or the cobra is to the human organism. Perjury should be characterized and reprobated in every charge to the grand jury of the counties; its odium and disqualification and disastrous effect should be taught in every school, denounced in the press and pulpits of the land; it should be gibbeted on the sky line of infamy for the execration of the ages. Let the judgment be affirmed.

Affirmed.

### On Suggestion of Error.

**Ethridge, J.**, delivered the opinion of the court on Suggestion of Error.

This case was affirmed on June 8, 1931, and reported in 135 So. 192. A suggestion of error was filed in which it was insisted that the language used by the prosecuting attorney in his argument, viz., ''Do you blame the defendant for coming on the witness stand and swearing a lie and committing perjury to save his life—I would do it myself,'' constitutes a statement of fact and was not a conclusion based upon facts, nor permissible as a deduction from facts.

The judges of Division B were divided in opinion upon the suggestion of error as to whether said statement constituted a statement of fact, or whether it constituted a

mere inference or conclusion of the prosecuting attorney. The former judgment was, thereupon, set aside and the case considered by the court en banc.

After full consideration of the case anew before the full court, upon all points, the court is of the opinion that the statement referred to was not a statement of fact, but a mere conclusion or inference drawn by the prosecuting attorney; and, while improper, as pointed out in the former opinion, did not constitute reversible error. The evidence was sufficient to sustain the conviction, and we find no reversible error in the record; and, for the reason set forth in the former opinion, the judgment of the court below is affirmed.

Affirmed.

**Anderson, J.** (dissenting).

I am unable to agree with the controlling opinion in this case, that the statement of the district attorney to the jury that he, situated as the appellant was, would commit perjury, was a mere conclusion from the evidence.

In my opinion, it was a statement of fact, pure and simple. It was testimony given by the district attorney as a witness in the case, without the sanctity of an oath, and was not a deduction from other evidence in the case, and was calculated to be very influential with the jury. The district attorney simply said to the jury, in effect, this: The appellant has committed perjury in this case in order to save himself, but he has done no more than you or I would have done under the same circumstances. If that was not testifying to a fact not otherwise in evidence, I am unable to see what it was.

This was a close case on the evidence. The appellant was the principal witness in his own behalf. If his testimony was true, he was entitled to an acquittal. The district attorney, the chief law officer of the state next to the Attorney General, said to the jury that they ought to en-

tirely disregard the testimony of the appellant, because he had perjured himself, and, in doing so, testified that he (the district attorney) would have done so under like conditions.