Robert D. HUGHES, Defendant, Appellant,

v.

STATE of Delaware, Plaintiff, Appellee.

No. 631980.

Supreme Court of Delaware.

Submitted Sept. 14, 1981.

Decided Nov. 18, 1981.

Randy J. Holland of Morris, Nichols, Arsht & Tunnell, Georgetown, and Samuel Dash (argued), Washington, D. C., for defendant, appellant.

Charles M. Oberly, III, Asst. State Prosecutor (argued), Wilmington, for plaintiff, appellee.

Before HERRMANN, C. J., and DUFFY, McNEILLY, QUILLEN and HORSEY, J.

DUFFY, Justice:

This is an appeal by Robert D. Hughes (defendant) who was sentenced by the Superior Court after a jury had found him guilty of Murder in the First Degree, 11 *Del.C.* § 636(a)(1).[1]

I

The State's case is based on circumstantial evidence and, in their respective briefs, the parties have examined in detail the evidence and the manner in which it was used by counsel in argument to the jury. For that reason, we state the facts at more length than usual.

About 6:35 a. m. on August 31, 1976, Hughes made a telephone call to the Milford Police Department and said, in effect, that he had found his wife, Serita Hughes, lying in the driveway near the rear of their house and that he needed a policeman or an ambulance. Sergeant Ingram, the first Milford police officer to respond to the call, was led by defendant to Mrs. Hughes who was covered by a blanket. A rope was pulled tightly around her neck and there was blood on her body. She was dead.

The Assistant State Medical Examiner testified that the victim had received two principal blows to the head, one of which had caused substantial external bleeding, but that the cause of death was ligature strangulation.[2] The Chief State Medical Examiner fixed the approximate time of

He intentionally causes the death of another person."

---

1. The Statute provides, in part:
   "(a) A person is guilty of murder in the first degree when:

2. Ligature strangulation is causing asphyxia by the use of a rope or similar cord.

death at about 11:30 p. m. on August 30 or shortly thereafter.

Hughes did not testify but he had given an account of what had occurred on the night of August 30 to the police when they arrived on the morning of August 31. His report was substantially as follows: Mrs. Hughes, who was a nurse, had worked the 3:00 p. m. to 11:00 p. m. shift on August 30 at the Milford Memorial Hospital. After putting his two small children to bed, he had turned on the rear house light for his wife and then went to bed about 10:00 p. m. He awakened about 6:00 a. m., discovered that his wife was not in bed, searched for her, and found her lying in the driveway. He did not touch her but he placed a blanket over her body and called the police.

Hughes later amended this account by saying that he had taken the children to a nearby market at about 10:00 p. m. and that he was in bed by 10:30 p. m.; he also said that he had checked his wife's pulse before placing the blanket over her. Hughes also told the police that he had an unlisted telephone number because his wife had received several obscene calls the previous spring, and that she may have been carrying cash or a check in the amount of fifty dollars in her wallet.

On the night of August 30 Mrs. Hughes had driven her car from the Hospital about 11:25 p. m. There is no evidence that she was followed from the parking lot. The drive from the Hospital to the Hughes residence, as measured by a detective, requires about nine minutes.

The immediate investigation of the crime scene and subsequent analysis of certain seized items produced the following evidence: A large amount of blood was on and about the victim's body and determined to be Type "O", which is the same as the victim's blood. A few drops of blood, also determined to be Type "O", were discovered on driveway pebbles between the body and the rear step of the house. Some pebbles were in disarray, possibly as a consequence of a struggle. Several red droplets were found on a rear step and later determined to be blood of some kind. Blood was not found elsewhere in the area. Experts testified that the assailant would likely have had blood on his hands and clothing.

The rope which was apparently used to strangle Mrs. Hughes was around her neck. At trial, the victim's father testified that that rope appeared to be the same rope that was attached to his grandson's wagon on August 19, 1976, when he had tied a handhold in the rope. A police photograph of the rear of the Hughes home, which was taken on the morning of August 31, shows the wagon without a rope. The same photograph shows that the first-floor master bedroom window was open that morning.

The victim's handbag was found next to her body with unidentified human blood and dirt on it. The bag was open and some of its contents were on the ground beside it. Her wallet was not in the bag, and it was never found. The evidence indicates that Serita Hughes generally carried her credit cards in her wallet but it does not indicate whether she had carried the cards or her wallet on the day of the murder.

A somewhat rusty tire iron was found on the driveway several feet from the victim's body but tests indicated that blood was not on it. The victim's father testified that he may have given a similar appearing tire iron to defendant some years before. In the opinion of a State expert, the tire iron was not used to inflict the victim's head laceration although a defense expert noted that, in his opinion, it may have been used to strike the head blow which did not cause external bleeding.

Inside the house, police officers found two ashtrays full of cigarette butts and a bedroom pillow on the couch in the living room, in an otherwise very clean and orderly house. Several officers testified that the defendant's and the victim's bed did not appear to have been slept in.

Some time after the Milford Police and the Delaware State Police had arrived at the Hughes home, and while their investigation continued, defendant was taken to State Police Troop 3 for questioning. State Police Sergeant Melvin, who had accompa-

nied defendant to Troop 3 and questioned him there, testified, in effect, as follows. Hughes was not considered to be a suspect until he gave what Sergeant Melvin considered to be "not normal" answers to questions, such as: (1) when asked about the possibility that blood might be found in his house, on his clothing or on his hands, defendant replied that it might be because his wife had had a heavy menstrual flow recently or because he had played with a neighbor's dog which was in heat; (2) when asked to name the best thing that had ever happened to him, defendant said it was accomplishing his goal of becoming a school teacher, and when asked to relate the worst happening, defendant replied that it was almost not getting through college; (3) when asked for a reason why blood was on the back step, he explained that a neighbor's little girl had cut her toe and had come to the back door asking for a Band-Aid; and (4) when asked whether he would consider himself a suspect if he were a police officer, defendant said yes.

During the interview, scrapings were taken from defendant's fingernails, but tests conducted to determine the possible presence of blood were negative. Defendant was then falsely told by Sergeant Melvin that a black light which was shone on his clothing indicated the presence of blood. Defendant again explained that any blood may have come from the neighbor's dog which was in heat. He also told the police that the clothing he was wearing (a striped polo shirt, slacks and sandals) was the same as that he had worn the day before. At the end of the interview, defendant was told he was a suspect and was given *Miranda* warnings. But he was neither arrested nor detained.

At about 2:30 a. m. the next morning, September 1, Hughes was arrested and charged with the murder of his wife. In searching the house, pursuant to a warrant, before the arrest, the police had found several of the victim's and several of the defendant's credit cards on a bedroom bureau, together with defendant's wallet which contained, according to the testimony of Detective Rimmer, who had conducted the search,

"approximately $50." Additionally, some pieces of paper, one of which had handwritten financial figures on it, were found in the bedroom. A yellow T-shirt with a "You Can Do It" logo on the front was found neatly folded in a laundry basket or on top of an ironing board in the master bedroom.

Police officers testified that, after being told that he was under arrest, defendant turned to his father and said that it had been the best summer he and Serita ever had. Then the police sprayed a chemical on defendant's hands and told him that it would show whether he recently had had blood on his hands. Defendant responded that it would not prove anything and that if the test detected blood, it may have come from having intercourse with his wife two nights before while she was menstruating. Hughes was then taken into the kitchen of his house where a chemical was sprayed on the wall. When asked if he had anything to say, he replied, "Well, I can say one thing. I didn't scrub the walls."

On September 8, 1976, seven days after the arrest, the State *nolle prossed* the murder charge because there was not sufficient evidence to support it. But two years and three months later, on December 4, 1978, Hughes was indicted and re-arrested on the same charge.

At trial, neighbors of the Hughes provided some evidence. Most testified that they had neither seen nor heard anything on the night of the murder. However, the neighbors did provide bits of evidence, some of which supplemented the principal evidence, and some of which corroborated or contradicted statements made by defendant.

A friend of the victim testified that Serita had called her on the morning of August 30 to talk about a menstrual problem she had and to tell the friend that she was going to call her doctor. A next-door neighbor testified that her dog was often around the Hughes house and that it is possible that her dog was in heat about the time of the murder.

A teacher friend of defendant's gave a statement to the police on September 3,

1976 and appeared at trial. She stated that Hughes and his two children had visited her home from about 7:05 p. m. to 7:50 p. m. on the evening of August 30. Hughes was wearing Docksiders, Bermuda shorts and a yellow T-shirt with the logo "You Can Do It" on it. Hughes told her that he and his wife had received a fifty-dollar check from Serita's parents to spend for dinner on their anniversary, which was the next day, and that Serita was holding it.

Two persons who were employed at a nearby convenience market on August 30, 1976 testified that, on that day, defendant had come to the store with his children about 10:15 or 10:20 p. m. Several neighbors testified that lights were not on in or around the Hughes house about 11:00 p. m. and 11:15 P.M. that night. One neighbor, who had lived in the house behind defendant, heard his dog barking shortly after midnight on the night of the murder. When he went to his rear door, he heard what he believed to be a man and woman arguing. The talking, which came from the general direction of the Hughes house, stopped when the neighbor turned on his outside light. Sometime prior to this incident the witness had heard a car door shut. Another neighbor who lived next to the Hughes said he had awakened about 6:30 a. m. on August 31 to the sound of a person crying and sobbing. Another neighbor testified that in talking with defendant after the murder, on the night of August 31, he mentioned that his son had come home about 12:30 a. m. and defendant responded by saying, "I hope he didn't see anything." Finally, as to Hughes' reaction to these circumstances, the testimony was quite conflicting, ranging from "he showed no emotion" to descriptions of shock, tears and distress.

Experts aligned on the respective sides produced substantially conflicting testimony. State experts were of the opinion that the victim had died face down and was later rolled over. The most compelling of the reasons advanced in support of that theory appears to be that the positioning of the victim's left arm and hand indicated that some degree of rigor mortis[3] had set in while the body lay in a face-down position. And, according to the experts, since rigor mortis generally begins between two and six hours after death, they opined that the victim's body, after death, had lain face down for at least two hours before being rolled over. On the other hand, defense experts said that the position of the left arm and hand was consistent with a theory that the victim had died on her back or, alternatively, that she was rolled over onto her back a very short time after death. Expert testimony regarding livor mortis[4] was consistent with either theory because the Assistant State Medical Examiner testified that livor mortis had not begun on the anterior side of the victim's body but had started in the posterior side. According to the Assistant State Medical Examiner, livor mortis becomes fixed six to eight hours after death and so it appears that the body could not have lain face down for that period of time.

A bloodstain expert testified for the State that, based on a series of experiments conducted with the bloodstained blanket which had covered the body, the blanket was probably placed over the victim between ten minutes and forty minutes after she was rolled over. But the experiments of a defense expert indicated to him that the blanket may have been placed over the body at any time up to six hours after death. This testimony was corroborated to some extent by the Assistant State Medical

3. Rigor mortis, according to the Assistant State Medical Examiner, is "a postmortem change that occurs because of chemical changes of the muscles of the body. It starts in the short muscles and proceeds in the larger muscles and the muscles stiffen up and remain that way for a certain amount of time."

4. Livor mortis, according to the Assistant State Medical Examiner, "is where there is a gravitational settling of the blood in the dependent portions of the body. In other words, if the body when it dies is lying on its back you will see the liver which is a sort of purple/reddish discoloration of the skin on the posterior portion."

Examiner who said that, because of the nature of the deep laceration on the forehead and the pooling of blood in the head caused by the ligature, the victim's head continued to bleed after death. And she noted that the head wound was still wet when she saw the body at 9:20 a. m. on August 31 and, likewise, the blood on the gravel next to the body appeared wet.

Finally, a police officer testified that a corner of the blanket was damp to the touch when he arrived on the scene, and an expert said that some type of moisture may have mixed with one of the bloodstains on the blanket. Given that testimony, another State expert stated that if the dampness had been caused by the formation of dew on the blanket, the blanket would had to have been outside for several hours before sunrise, which occurred about 6:35 a. m. on that particular morning. However, this evidence was contradicted by a defense expert whose opinion differed from the State's expert concerning the latter's explanation of moisture mixing with the blood on the blanket, and by a defense expert who opined that even though dew probably formed that morning in the open, grassy areas, it had not formed on the ground around the victim because the house and trees reduced the heat loss necessary for formation of dew. And he further testified that because the quilt-like blanket is a poor thermal barrier, its temperature would not drop to the dew point but would be influenced by the temperature of the body, making the formation of dew on it not even "remotely possible."

## II

We now consider defendant's arguments in support of his contentions that reversal is required because of prejudicial errors in the proceeding and that a new trial should be ordered. The State vigorously responds to those arguments and contends that Hughes was convicted after a fair trial.

### A.

First, Hughes says that the State made numerous improper statements to the jury which were highly prejudicial to his right to a fair trial.

On at least two occasions in recent years this Court has discussed the permissible bounds of comment by the prosecution in summation arguments. *Sexton v. State*, Del.Supr., 397 A.2d 540 (1979), was the first of these. There the Court said this:

"Not every improper remark by a prosecutor requires reversal, but only that which prejudicially affects substantial rights of the accused. Super.Ct.Crim.R. 52(a); *Edwards v. State*, Del.Supr., 320 A.2d 701 (1974).

\* \* \* \* \* \*

Although the prosecutor operates within an adversary system, his duty is to seek justice, not merely convictions.

'A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial.' *Bennett v. State*, [3 Storey 36] Del.Supr., 164 A.2d 442, 446 (1960).

That same duty requires the prosecutor to refrain from legally objectionable tactics calculated to arouse the prejudices of the jury." 397 *A.2d* at 544.

In *Sexton* we also quoted, with tacit if not express approval, the following ABA Standards, the Prosecution and Defense Functions (Approved Draft, 1971):

"1.1 The function of the prosecutor.

(a) The office of prosecutor is an agency of the executive branch of government which is charged with the duty to see that the laws are faithfully executed and enforced in order to maintain the rule of law.

(b) The prosecutor is both an administrator of justice and an advocate; he must exercise sound discretion in the performance of his functions.

(c) The duty of the prosecutor is to seek justice, not merely to convict.

\* \* \* \* \* \*

5.5 Opening statement.

In his opening statement the prosecutor should confine his remarks to evidence he intends to offer which he believes in good faith will be available and admissible and a brief statement of the issues in the case. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence.

\*  \*  \*  \*  \*  \*

5.6 Presentation of evidence.

\*  \*  \*  \*  \*  \*

(b) It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

\*  \*  \*  \*  \*  \*

5.8 Argument to the jury.

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

\*  \*  \*  \*  \*  \*

5.9 Facts outside the record.

It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice."

The second and more recent case is *Hooks v. State*, Del.Supr., 416 A.2d 189, 204 (1980), in which this Court wrote as follows:

"The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial. He is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from that evidence. *State v. Mayberry*, N.J.Supr., 52 N.J. 413, 245 A.2d 481 (1968), cert. den. 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969). The prosecutor, nevertheless, must remember his unique position within the adversary system. '[I]t is fundamental that his obligation is to protect the innocent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public.' ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function, § 1.1, Commentary at 44 (Approved Draft, 1971) (hereinafter ABA Standards). Over forty years ago, Justice Sutherland in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) spoke of the prosecutor's duty:

'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'

This Court has expressed similar sentiments in *Bennett v. State*, Del.Supr., 3 Storey 36, 164 A.2d 442, 446 (1960):

'A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial.'

These general comments extend to the propriety of the content of closing argument as well as to the other aspects of a criminal trial. Closing argument is 'an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound.' *Donnelly v. DeChristoforo, supra,* 416 U.S. [637] at 649, 94 S.Ct. [1868] at 1874, 40 L.Ed.2d [431] at 440 (dissenting opinion of Justice Douglas). '[T]he process of constitutional line drawing in this regard is necessarily imprecise . . . .' *Id.* 416 U.S. at 645, 94 S.Ct. at 1872, 40 L.Ed.2d at 438 (Justice Rehnquist's opinion for the Court). Indeed, it is frequently difficult to ascertain whether courts are speaking of errors so fundamentally unfair as to deny the defendant due process or whether courts are merely exercising their supervisory power to curtail prosecutorial misconduct. But, in either event, the ethics of the legal profession are in issue. . . ." 416 *A.2d* at 204–05.

With these parameters in mind, we proceed to the issues. As a threshold matter, however, we note the absence at trial of objections to some of the statements made to summation that are now contested. We will, however, consider the alleged errors for two reasons: first, the Trial Judge gave arguably vague directions to defense counsel concerning the permissible scope for making such objections; and, second, given the nature of what is involved, the interests of justice require that we do so. See Supreme Court Rule 8.

### (1)

Hughes contends that in final arguments to the jury the State misstated the evidence and argued facts not in evidence to connect him with blood from the victim. The result, he says, is that the State's summation included unsworn, false testimony.

As we have said, the State's case against Hughes is based entirely on circumstantial evidence. Although there was testimony to the effect that whoever had killed Mrs. Hughes would have had blood on his person and clothing, the State at no time introduced probative evidence that Hughes had blood on his person or clothing on the night his wife died. Much of the evidence relating to blood concerned Hughes' nebulous statements to the police. With little if any evidence relating to motive, the State's evidence connecting Hughes with blood from the victim and the arguments it mounted from that evidence were particularly significant. That was emphasized in the State's summation and rebuttal to the jury in which the prosecutors made these remarks:

"Do you believe that Mr. Hughes was worried about the possibility of that blood [from Mrs. Hughes' menstrual flow] being on his hands or does it comport with what . . . [a State expert] said, and even their own experts say, whoever strangled that woman surely would have gotten a good deal of blood on his hands.

\*  \*  \*  \*  \*  \*

The scenario that the defendant is trying to sell you is preposterous. First of all, . . . [counsel for defendant] talks about the defendant didn't have any blood on his hands. Didn't have any blood on his fingernails. Ladies and gentlemen, the defendant himself admitted to having blood on his hands. He said that he got blood on his hands because he had sex with his wife. He said that. We didn't. He admits to having blood on his hands. He washes them later, I suppose. He didn't have blood under his fingernails. You heard testimony that he doesn't have any fingernails. His fingernails were all chewed down but . . . [defense counsel] tried to say we never put blood on his hands. We did put blood on his hands. He told us there would be blood on his hands because the night before he had sex with his wife. He had it not only on his hands but on the sheets. He tells us that.

... [Defense counsel] tries to tell us we haven't proven blood on his hands. We have proved blood on his hands through his own mouth. When he is confronted, when he is told he might have blood on his hands, what does he say? He says, 'That doesn't prove anything.'

\*   \*   \*   \*   \*   \*

Now, ... [defense counsel] said we didn't show any blood on his hands. We didn't show any blood on his clothes. Didn't show any blood in his house. The defendant tells us there may be blood in the house. The defendant tells us he had blood on his hands because he had sex with his wife the night before."

These remarks clearly misstated the evidence. The record does *not* show that the State "proved blood on his hands through his own mouth."

On August 31, 1976, Hughes was taken to State Police Troop 3 for questioning. At Troop 3, when asked about blood which had been found on the rear step of his house, Hughes answered, according to the testimony of a State policeman, "that a neighbor's child, a little girl ..., had cut her toe ... and she came to the back door, knocked on the door and asked for a Band-Aid." When asked if there would be blood inside the house, Hughes responded, "probably ... because his wife was having menstrual problems and that she was bleeding very badly for a period of days prior to that ...." When asked if there would be blood on his hands, Hughes replied that "he probably did and did have blood on his hands because he and his wife had had intercourse the night before and he had had blood on his hands and on the bed clothing." When asked if there would be blood on his clothing, Hughes answered that "he probably would have ... because there was a dog ... he had been playing with that had menstrual problems ... [and] the dog had rubbed up against him and he had petted the dog ...." And at the police station, the police, in an admitted ruse, told Hughes that a light test showed blood on his clothing. Hughes responded "that possibly, what was indicated to be blood ... he very

well may have received ... from a neighbor's dog that was in heat."

When defendant was arrested on September 1, 1976, the police sprayed a chemical on his hands and on his kitchen wall and then told him that both tests indicated the presence of blood. Hughes responded to the hand test by stating that "if there was blood it may have come from having intercourse with his wife several nights earlier." Hughes responded to the wall test by stating, "Well, I can say one thing. I didn't scrub the walls."

All of these statements by Hughes were speculative responses concerning the presence of blood on his hands, his clothing and inside his house as a consequence of events preceding the murder. But the statements (at least one of which had been obtained by trickery), with little meaningful proof of blood at any time and with no probative proof of blood after the murder, were elevated into fact during the State's rebuttal, thus: "We have proved blood on his hands through his own mouth."

Evidence as to blood on Hughes, his clothing or inside his home was material only if placed there *after* Serita Hughes had been murdered. Evidence as to blood on Hughes or his clothing *before* the murder was admissible for background or foundation purposes. But the probative value of such evidence depends on the time at which it was connected to Hughes, that is, before or after the murder. And the difference is crucial.

In its argument in this appeal, the State ignores or attempts to blur the difference (as it did in argument to the jury) between Hughes' speculation about the possibility of blood on his person after the murder and the presence of blood on his person before the murder. As we have said, the latter is not material in the absence of a connection that was never made, and the former is not probative proof of the finding of blood after the murder. In short, the State never proved blood on Hughes or his clothing or in his house after the murder. But, whether

read independently, or in context, the State's argument to the jury was plain and highly prejudicial error.

The State's total summation was long, covering some 146 pages in the trial transcript. Under these circumstances, we agree with the State that the prosecutors' review of the evidence and the development of permissible hypotheses may permit some margin for error that is not a basis for reversal. But in the factual context of this case, the evidence as to blood had a crucial significance and such serious misstatements thereof, many made in rebuttal argument at the end of a twenty-seven day trial, are too large to overlook when justice and a fair trial are the objectives of the system.

The jury listened to expert testimony saying that whoever murdered Serita Hughes would most likely have gotten blood on his hands. The jury heard police testimony that Hughes had stated that he did not touch his wife's body except to cover her with a blanket and, possibly, to take her pulse. Arguably, the presence of blood on Hughes, if proved, is a cornerstone of the State's case. Accordingly, for the State to declare that it had "proved" that Hughes had blood on his hands after the murder, at the least, was to say that the evidence showed that he had lied about the blood and, at worst, it was a way of saying that the presence of blood on him proved that he was the murderer.[5]

(2)

Hughes also argues that the State in rebuttal impermissibly labelled many of his pre-trial, out-of-court statements as "lies," which amounted to expressions by the prosecution through unsworn testimony of its personal belief about Hughes' veracity.[6]

This aspect of prosecutorial argument is troublesome because it is not susceptible to clear line-drawing, that is, whether a prosecutorial statement is a legitimate inference or an impermissible personal opinion. The latter is prohibited by *Sexton*, in which the Court (as we have said) approved § 5.8(b) of the ABA Standards relating to the Prosecution and Defense Function; thus:

> "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."[7]

But the prosecutor "is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from [the] evidence." *Hooks*, 416 A.2d at 204.

The question of whether (or when) a prosecutor may permissibly argue to the jury that a witness (or a defendant) has "lied" or is a "liar" has been discussed by many courts and the parties have called our

---

**5.** The State's misuse of its evidence as to blood is further illustrated by the introduction of evidence relating to a chemical test to show the presence of blood. The validity of the test was a contested issue. The State, however, stipulated that it would use the test only for the purpose of showing defendant's reaction to it. But during trial the State elicited testimony that the test result was positive and indicated the presence of blood. Thus:

> "THE COURT: *All right. A glow appeared. The State is not contending the glow indiated [sic] the presence of blood; correct?*
> MR. HOLLAND: Yes.
> MR. DALTON: That's correct for the stipulation that went on prior to this and it was agreed to by counsel earlier.
> BY MR. DALTON:
> Q *Was there a glow?*
> A *Yes*, there was.
> Q When you saw the glow, did the defendant recognize the glow?

A Yes, he did.
Q Did he respond in any way?
A He made a statement, 'That doesn't mean anything.'
Q Did you perform that same test which we have just spoken about on the sandal of the defendant?
A Yes.
Q What happened? Would you tell us what happened there?
A Well, we got the *same positive reading* on the test of the sandal as we did on the defendant's hands." (Emphasis added.)

The Trial Judge gave a cautionary warning to the jury, but the State had made its point.

**6.** Defendant's Rule 33 motion for a new trial was based in part on the prosecutor's argument on the "lies" issue.

**7.** The Third Circuit adopted the same standard in *United States v. LeFevre*, 3 Cir., 483 F.2d 477, 479 (1973).

attention to cases which support their respective views.[8]

██ In our opinion, "liar" is an epithet to be used sparingly in argument to the jury. It is a flashboard more likely to create heat in a contentious courtroom than it is to illuminate the search for truth. But, more particularly, the prosecutor who labels testimony as a lie runs the risk of passing from a legitimate inference drawn from the evidence, *Hooks,* supra, to the expression of an impermissible personal opinion. *Sexton,* supra. We say this because a witness or a party may be mistaken, uninformed, or erroneous in his facts or conclusions in many ways, and yet not be a liar; labelling a witness as a "liar" or to argue that he has "lied" is to say something quite different about his testimony. The characterization of testimony as a "lie," (even when it is tempered by such modifiers as "the State contends" or "I suggest"), is necessarily to say that the witness made "an untrue statement with intent to deceive." *Webster's Third New International Dictionary* (1961). It is in this sense we use the word here.

██ Striking the balance between permissible and impermissible comment by a prosecutor, calls for the exercise of a sound discretion by the Trial Judge. Cf. *LeFevre,* 483 F.2d at 479. In exercising that discretion, the Trial Judge must prohibit a prosecutor from calling the testimony or statement of a witness or party as a "lie" unless, (a) that is a legitimate inference which may be drawn from the evidence, and (b) the prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie. Any statement in *Sexton* which implies a broader prohibition is overruled. If the prosecutor's argument in support of his right to label testimony a "lie" amounts to no more than saying that the jury should believe the State's witnesses and not those of defendant, the comment is impermissible.

██ The comments by the prosecution in this case did not comply with the standards stated herein and, therefore, were erroneous.

██ In reviewing charges of prosecutorial misconduct based on the impermissive use of the epithet "lie" or "liar," we consider whether the remark "prejudicially affect[ed the] substantial rights of the accused." *Sexton,* 397 A.2d at 544. For that purpose we adopt the standard recently formulated in *Dyson v. United States,* D.C. App., 418 A.2d 127, 132 (1980), thus:

> " 'The decisive factors are the closeness of the case, the centrality of the issue affected by the [alleged] error, and the steps taken to mitigate the effects of the error.' "

██ Applying that test here, it appears that the State's case against Hughes was based entirely on circumstantial evidence; that a motive for the murder was never established; and that there was little, if any, tangible evidence connecting Hughes to the murder. But the State counted up for the jury what it labeled as "lies" by Hughes on twelve occasions;[9] the prosecu-

8. The State relies on such cases as *People v. Wirth,* Ill.App.Ct., 77 Ill.App.3d 253, 32 Ill.Dec. 725, 395 N.E.2d 1106, 1111 (1979); *Blackwell v. State,* 161 Miss. 487, 135 So. 192, 195 (1931); *Commonwealth v. Glass,* 486 Pa. 334, 405 A.2d 1236, 1243 (1979); *State v. Allen,* S.C.Supr., 266 S.C. 468, 224 S.E.2d 881, 888 (1976); *State v. Beasley,* Tenn.Supr., 536 S.W.2d 328 (1976); *McKinney v. State,* Tenn.Ct.Crim.App. (March 29, 1979) (Unreported).

Cases cited by defendant include: *United States v. Restrepo-Granda,* 5 Cir., 575 F.2d 524, 529–530 (1978); *People v. Alston,* N.Y.App. Div., 77 A.D.2d 906, 431 N.Y.S.2d 82, 83 (1980); *People v. Manson,* N.Y.App.Div., 63 A.D.2d 686, 404 N.Y.S.2d 659 (1978); *State v. Locklear,* N.C.Supr., 294 N.C. 210, 241 S.E.2d 65, 70

(1978); *Robertson v. State,* Okl.Cr., 521 P.2d 1401, 1402 (1974); *Commonwealth v. Kuebler,* Pa.Supr., 484 Pa. 358, 399 A.2d 116, 118, 119 (1979); *Commonwealth v. Potter,* Pa.Supr., 445 Pa. 284, 285 A.2d 492, 493 (1971); *Commonwealth v. Balazick,* Pa.Super., 278 Pa.Super. 17, 419 A.2d 1333, 1334 (1980); *Commonwealth v. Bullock,* Pa.Super., 284 Pa.Super. 601, 426 A.2d 657, 660 (1981).

9. The prosecutor said, for example:

"In my opening statement I told you we were going to prove this wasn't a robbery. I told you we were going to show you that no one else was in that area. I told you that we were going to show you the defendant lied. Right after his wife's death he lied. Not one

tor argued that Hughes lied about where his wife's credit cards were found, the persons to whom he talked about the case, in what he wrote to the victim's mother, about the clothing he had worn the night his wife was murdered, the time he went to sleep, and so on.

As in *Dyson*, the "matter for jury consideration consisted entirely of deciding whether to" accept the circumstantial evidence which the State had assembled or the defendant's statements; and,

> "[t]he jury's assessment of the believability of either version was dispositive of its finding of guilt or innocence. Against this backdrop and at the risk of distortion, the challenged prosecutorial comments were directed again and again at the veracity of the defense witnesses."

*Dyson*, 418 A.2d at 132. Cf. *People v. Alston*, 431 N.Y.S.2d at 83; *State v. Locklear*, 241 S.E.2d at 68, 69; *Commonwealth v. Kuebler*, 399 A.2d at 119.

In our opinion, the case was a close one before the jury, the central issue of credibility was affected by the prosecutors' statements and the Trial Judge's general statements on the duty of the jury did not mitigate the effects of the error. It follows that the remarks prejudicially affected Hughes' substantial rights.[10]

### B.

Hughes argues that the prosecution, during summation, impermissibly depicted his courtroom demeanor as unemotional, unfeeling and without remorse. Hughes did not testify at trial; accordingly, he says that comment relating to his courtroom behavior is comment on a matter not in evidence and, therefore, is improper.

In our view, the courtroom demeanor of a defendant who has not testified is irrelevant. His demeanor has not been entered into evidence and, therefore, comment is beyond the scope of legitimate summary. See generally, *Borodine v. Douzanis*, 1 Cir., 592 F.2d 1202, 1210–11 (1979); *Villacres v. United States*, D.C.Ct.App., 357 A.2d 423, 426 n. 4 (1976); *State v. Smith*, Mo.Ct.App., 588 S.W.2d 27, 32 (1979). Moreover, the practice is pregnant with potential prejudice. A guilty verdict must be based upon the evidence and the reasonable inferences therefrom, not on an irrational response which may be triggered if the prosecution unfairly strikes an emotion in the jury. And certainly during the prosecution for a crime as outrageous as this one, the prosecutor must refrain from unfairly fanning the flames of passion.

The practice is also suspect because it assumes that there is such a thing as a model of "normal" courtroom behavior. And that is dangerous: one may reveal or conceal emotion for innumerable reasons, and a defendant should not be subjected to a guilty verdict because his courtroom appearance did not comport with the prosecution's notion of a norm. The practice would necessarily give the prosecution 20–20 hindsight in every summation (after having observed a defendant throughout trial) and would encourage an appeal to the jury's passion rather than to the evidence.

We conclude that the comments by the prosecution about Hughes' courtroom demeanor were improper.

### C.

During rebuttal, the prosecution offered the following characterization of the

---

time. Not two times. Not three times. Not six times. Not ten times but at least twelve times that we can show you. I have proven all this. I have shown you all this.

\* \* \* \* \* \*

And, ladies and gentlemen, we would suggest to you that there is at least one more lie in that letter. How do you judge somebody's credibility? You judge somebody's credibility on what they said in the past. He has lied at least three times in that letter.

We are asking him not to get away with the fourth lie."

10. The State relies on our recent opinion in *Styler v. State*, Del.Supr., 417 A.2d 948 (1980), in arguing that its characterization of defendant's statements as "lies" did not go beyond fair comment. In *Styler*, under the circumstances of that case, we concluded that the statements by the prosecutor "viewed as a whole and in context" did not amount to reversible error in that case. 417 A.2d at 949, a ruling which is not controlling under the circumstances of this case.

investigation leading to Hughes' indictment:

"The investigation took us two years, ladies and gentlemen. The defendant was initially released because we didn't have a lot of this evidence and because all of these pieces weren't put together. And, ladies and gentlemen, due to the fact for two years we investigated this case and the fact that we were careful. Because we arrested the defendant, we plead guilty. That's right. We took our time. We take our time before we arrest somebody in a first degree murder. That's right. We plead guilty to that."

Hughes contends that this language was prejudicial because it infers that the State will not arrest someone until it is certain of his guilt and, accordingly, that destroys his presumption of innocence. The statements were prejudicial and inexcusable. They are patently removed from a permissible comment describing thorough, well-performed police work; instead, the statements imply that the police will not arrest someone until they know that he is guilty—and that is a glaring misrepresentation. To condone such prosecutorial commentary is to condone the presumption of a defendant's guilt by the mere fact of his arrest. And that is error.

\* \* \*

■ In our opinion, the cumulative impact of the errors discussed in II substantially affected Hughes' right to and deprived him of a fair trial. For that reason, we reverse the judgment of the Superior Court and remand the case for a new trial.

### III

We need not consider other arguments made by the parties but, in view of the remand, we express our views on certain of those for the guidance of the Trial Court. We caution, however, that these broad prospective comments do not imply error for every literal violation thereof. Indeed, some violations might be harmless error and some literal violations, in specific context, might not even be error.

### A.

Hughes did not testify. In closing, the prosecution characterized certain evidence as essentially unrebutted. Hughes argues that such description infringed upon his right to choose not to testify, because it was apparent that he was the only person who could have rebutted the State's evidence. Even assuming that only Hughes could have rebutted the evidence, however, we believe the prosecution's statements were within permissible bounds.

■ The prosecution is, of course, free to comment on the evidence and the reasonable inferences therefrom, Vess, *Walking a Tightrope: A Survey of Limitations on the Prosecutor's Closing Argument*, 64 Journal of Criminal Law and Criminology 22, 27 (1973), and, generally speaking, a characterization of evidence as uncontradicted is permissible. *See, e. g., White v. State*, Fla. Supr., 377 So.2d 1149, 1150 (1979), cert. denied, 449 U.S. 845, 101 S.Ct. 129, 66 L.Ed.2d 54 (1980); *Kirkland v. State*, Nev.Supr., 590 P.2d 156, 158 (1979). When only the defendant can deny or contradict the evidence, however, and when he has not taken the stand, several courts prohibit a prosecutorial description of evidence as uncontroverted. *See, e. g., Thompson v. State*, Ala. Ct.Crim.App., 382 So.2d 1184, 1185 (1980); *Todd v. State*, Tex.Ct.Crim.App., 598 S.W.2d 286, 294 (1980); *Vess*, supra, at 37. But that is not the universal rule. *See, e. g., People v. Hopkins*, Ill.Supr., 52 Ill.2d 1, 284 N.E.2d 283, 285–86 (1972); *People v. Fritz*, Ill.App.Ct., 77 Ill.App.3d 1, 32 Ill.Dec. 506, 509, 395 N.E.2d 736, 739 (1979).

*Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) is the base for Hughes' argument. *Griffin* holds that the Fifth Amendment proscribes "comment by the prosecution on the accused's silence . . . ." *Id.* at 615, 85 S.Ct. at 1233, 14 L.Ed.2d at 110. Our inquiry, then, is whether the statements complained of were permissible comments placing evidence into context or impermissible comment on Hughes' failure to take the stand.

We have recently framed such an inquiry as "whether the prosecutor utilized the silence to create an inference of guilt, recognizing that not all such remarks would have a prejudicial impact on the jury's deliberations requiring reversal." *Hooks*, 416 A.2d at 206.

We conclude that the statements made here did not create an inference of guilt. The fact that defendant did not testify is a somewhat attenuated conclusion to be drawn from a prosecutorial description of evidence as "unrebutted," in an argument directed to the weight to be given to the evidence. In the context of this case, we are unable to say that the prosecution prejudicially utilized defendant's silence to create an inference of guilt.

### B.

During the trial, the prosecution offered testimony from several of Hughes' neighbors and associates to the effect that he had never discussed his wife's murder with them. Over objection, the Trial Court received such testimony to impeach a statement by Hughes written in a letter to his mother-in-law, which read in relevant part: "I heard no sound nor did any of the neighbors." At a pre-closing chambers conference, the Trial Judge repeated that such testimony was admissible and instructed defense counsel not to object to the prosecution's closing on that basis. In closing, the prosecution referred to Hughes' silence but did not link his silence to the statement in the letter.

Hughes argues that the Trial Court erred in permitting the testimony and summation concerning his post-arrest silence (he had been arrested on September 1, 1976 but the charge was *nolle prossed* seven days later), citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

We are unpersuaded by that argument. *Doyle* prohibited cross examination concerning the post-arrest silence (apparently while in police custody) of two defendants, each of whom had received *Miranda* warnings. *Doyle* is distinguishable

from the present situation, if for no other reason, because the contested testimony here, although concerning Hughes' silence after his initial arrest, *also* encompasses his silence after the original charge was *nolle prossed*. Stated differently, the period of Hughes' silence testified about at trial was not incident to a *Miranda* "custodial interrogation"-type of situation, and, therefore, we conclude that *Miranda* and its progeny do not apply.

### C.

Hughes' next argument concerns his Sixth Amendment right to counsel. On May 24, 1977, during the interim between the State's *nolle prosequi* and the subsequent indictment, Hughes spoke with Mrs. Lucille Bell, his mother-in-law, at her request. Mrs. Bell, with police assistance and without Hughes' knowledge, recorded the conversation. At trial, Mrs. Bell read statements from a transcript of the recorded conversation, and the prosecution commented on those statements in summation. Hughes contends that this police activity violates his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

Assuming *arguendo* that Mrs. Bell was acting as a police agent, we note that Sixth Amendment rights do not attach until the " 'critical stages' of the prosecution" are reached. *See United States v. Henry*, 447 U.S. 264, 269, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980).

"Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him— 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239 [51 L.Ed.2d 424] (1977) (Citations omitted.)

We are unable to say that Mrs. Bell's taped conversation occurred during Hughes' prosecution, let alone a "critical stage" of it: the conversation took place more than seven months after the State's *nolle prosequi* and more than a year prior to his indictment. It occurred pursuant to an investigation, not a prosecution. Accordingly, we find no violation of Hughes' right to counsel.

## IV

Defendant also argues that he was denied his right to a fair trial when the jurors, who had been permitted to separate over the weekend after deliberations had begun, were exposed to newspaper statements [11] in which the prosecutors made highly inflammatory out-of-court comments on the case, in violation of the *Delaware Lawyers Code of Professional Responsibility*, DR 7–107(D).[12]

In our opinion, the comments by the prosecutors plainly and clearly violated the *Code of Professional Responsibility*, DR 7–107(D). Cf. *Chicago Council of Lawyers v. Bauer*, 7 Cir., 522 F.2d 242 (1975); *State v. Van Duyne*, N.J.Supr., 43 N.J. 369, 204 A.2d 841, 852 (1964). See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in which the Supreme Court said this:

"The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." 384 U.S. at 363, 86 S.Ct. at 1522.

See 65 Cornell L.Rev. 1106 (1980); *Hirschkop v. Virginia State Bar*, E.D.Va., 421 F.Supp. 1137 (1976).

Here, in particular, one of the prosecutors should have known that his reference to the lie-detector test would be "reasonably likely to interfere with a fair trial"; that significant comment went beyond the permissive bounds of reference to the "public record." The comments by both prosecutors were in violation of the ABA Standards Relating to the Prosecution Function § 1.3,[13] and were particularly objectionable in view of this

---

11. The news report appeared in the *Philadelphia Inquirer* on February 10, 1980, the day before the jury rendered its verdict. The article, in pertinent part, stated:

"Hughes was charged with murder within hours of the incident but was released within a week. The Delaware State Police said they did not have enough evidence then to seek an indictment.

However, the case remained open and about a year after the murder a curious circumstance—as unusual as everything else about this murder—led to active scrutiny by the state police.

Oberly said that a state policeman attending a lie-detector seminar in Chicago was given a copy of a polygraph test that Hughes had taken in Michigan while preparing his defense. The test was passed out by the lecturer to illustrate a point, but to officer John Bisby the test results were interesting enough to reopen the case.

The state police then began a massive investigation. They spent more than 4,000 hours interviewing several hundred people in at least six states.

\* \* \* \* \* \*

Prosecutors Bartholomew J. Dalton and Oberly said Hughes apparently had a quarrel with his wife that night and may have killed her in a fit of anger."

The last comment was pure speculation because the record indicates that a neighbor of the Hughes heard only unidentified voices quarreling after 11:30 on the night of the murder.

12. DR 7–107(D) states as follows:

"During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to the trial, parties or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case."

13. Section 1.3 reads:

"(a) The prosecutor should not exploit his office by means of personal publicity con-

Court's ruling that the results of a polygraph examination are inadmissible. *Williams v. State*, Del.Supr., 378 A.2d 117 (1977).

## V

We note Hughes' argument that the State's evidence was insufficient to support the verdict. The test we apply is "whether the evidence [be it direct or circumstantial], viewed in its entirety and including all reasonable inferences, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt." *Holden v. State*, Del. Supr., 305 A.2d 320, 322 (1973). That test has been met in this case.

## VI

Finally, Hughes contends that he was deprived of a fair trial and due process of law by reason of the Trial Court's permitting the jury to separate to their homes for the entire weekend after the trial of this highly publicized and notorious murder case had ended, after the Trial Judge's jury instructions had been delivered, and after the jury had begun its deliberations—exposed, among other influences, to improper newspaper publicity.

### A.

The month-long trial of this case was the subject of extraordinary State-wide as well as local public interest. The news media coverage before and during the trial was extensive. Newspaper clippings in the record, appended to defendant's motion for a new trial, total 80; during the trial itself, the record shows 49 such newspaper articles. Articles, published daily during the trial, recounted various aspects of the trial, including summaries of certain testimony.[14]

On the day before the completion of closing arguments to the jury, the following exchange took place between the Court and defense counsel:

"THE COURT: If you don't finish your summation by around 4:00 o'clock, I will bring them in and charge them Friday morning. If you finish your summations by, say, 2:30 or 3:00—well, this charge is not going to take long. I will charge them and send them out for a couple of hours and then ask them if they want to go home and sleep on it. I am not going to lock them up. It is too expensive and too inconvenient around here. In Wilmington they are lucky to have the two hotels in walking distance. Here, when we have the juries locked up, we have to hire school buses and it is a mess.

MR. HOLLAND: Don't you think where the State has spent as much money as it has, would it not be appropriate to spend that much more to lock them up for one night?

THE COURT: No jury in a serious case—this is Pennsylvania case law—it is not in error to send them home. You just give them special instructions not to call each other on the phone or get together in small groups.

MR. HOLLAND: If we can do it, Your Honor, can we stay later?

THE COURT: I don't want to keep them after dark. This is a day and age where that is not comfortable."

The Trial Court also stated that sequestration of the jury under the circumstances would be "coercive."

Under all of the circumstances of this case, the Trial Judge manifestly abused

---

nected with a case before trial, during trial and thereafter. (b) The prosecutor should comply with the ABA Standards on Fair Trial and Free Press."
Section 1.1 of the ABA Standards Relating to Fair Trial and Free Press, Approved Draft, 1968 recommended that:
"During the trial of any criminal matter . . . no lawyer associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating

to the trial or the parties or *issues in the trial* . . . ." (Emphasis added.)

14. One article entitled, "Court Curiosity Keeps Hughes Murder Trial At Capacity," summarized the broad community interest which had arisen around the trial. Another article, entitled, "Hughes Writes Wife's Mother" was devoted to reprinting the entire contents of the letter defendant wrote to his wife's parents sometime after her death.

his discretion in failing to sequester the jury after the commencement of its deliberations.

█ While the sequestration of a jury during its deliberations is now within the sound judicial discretion of the Trial Judge under Superior Court Criminal Rule 24(f),[15] there is an historical background of that Rule against which that discretion must be exercised with due care and caution. The progenitor of Rule 24(f) provided that unless otherwise ordered by the Court, "jurors will not be sequestered and may be permitted to separate at any time during the trial *prior to retirement for deliberation.*" (Emphasis added.)[16]

Just days before the amendment of Rule 24(f), this Court stated in *Bailey v. State*, Del.Supr., 363 A.2d 312 (1976):

" * * * we take the occasion to issue a caveat. This was a capital case surrounded by racial tensions. Fortunately, there was no mishap which may have required a wasteful repetition of this lengthy trial on the grounds of jury interference. In our opinion, sequestration in this type of situation would have been advisable during the entire trial, as protection against any such mishap." (363 A.2d at 319).

Compare *Styler v. State*, Del.Supr., 417 A.2d 948 (1980).

In the words of the Third Circuit, "[t]he day has long passed when jurors were sent to deliberate upon their verdict and were 'kept without meat, drink, fire or candle,' until they reached a verdict."[17] *U. S. v. Piancone*, 3 Cir., 506 F.2d 748, 749 (1974). In Delaware, as in most common law jurisdictions, it was the time-honored practice

not to permit the jury to separate, especially in a felony case, after deliberations had begun and before the verdict was rendered. See *Commonwealth v. Della Porta*, Mass. Supr., 324 Mass. 193, 85 N.E.2d 248 (1949). In *State v. Brown*, Del. O. & T., 2 Marv. 380, 36 A. 458, 459 (1896), the Court said, "in felonies of as high a grade as murder in the second grade, the jury ought not to separate."

█ Against this historical background, it is clearly the duty of a Trial Judge to exercise his discretion under Rule 24(f) with great caution, especially after the jury has commenced deliberating, according due consideration to the nature of the case, extraordinary public interest in the case, and possible prejudicial effects upon even one juror of interaction with the public, news media, family or friends. This is especially so when, as here, a long week-end recess confronted the Trial Judge. And also to be considered in the exercise of such discretion is the proposition that when there has been a prolonged separation interrupting deliberations, during which the jurors move about at will, silence or oral statements of jurors that they have not discussed the case or have not been guilty of other misconduct may be "a mere formality, and not capable of refutation by the accused." *Kimoktoak v. State*, 578 P.2d at 596.

The reasons given by the Trial Judge in this case for not sequestering the jury ("too expensive"; "to inconvenient around here"; "we have to hire school buses and it is a mess") do not reflect the requisite consideration of the factors which should have governed the exercise of discretion on the issue of sequestration under all of the circum-

---

15. Superior Court Criminal Rule 24(f) (effective 8/17/76) provides: "There will be no sequestration of jurors, unless ordered by the Court."

16. In 1976, under the prior Rule 24(f), allowing this jury to separate during its deliberations would undoubtedly have been "per se reversible error." See *Kimoktoak v. State*, Alaska Supr., 578 P.2d 594 (1978); *People v. Ritzert*, Ill.App., 17 Ill.App.3d 791, 308 N.E.2d 636 (1974).

17. It is noteworthy that, in this case, vestiges of the historical background of Rule 24(f) appeared in the customary oath administered to

the bailiff just before this jury retired to deliberate:

OATH TO BAILIFF

"DO YOU, _____, SOLEMNLY SWEAR UPON THE HOLY BIBLE OF ALMIGHTY GOD THAT YOU WILL CONDUCT THESE JURORS TO SOME CONVENIENT ROOM AND THERE KEEP THEM, AND THAT YOU WILL NOT ALLOW ANY PERSON TO SPEAK TO THEM, NOR WILL YOU SPEAK TO THEM YOURSELF, WITHOUT LEAVE OF THE COURT, EXCEPT TO ASK THEM WHETHER THEY ARE AGREED OF THEIR VERDICT, SO HELP YOU GOD?"

stances of this case. Clearly, there was an abuse of discretion in denying the defendant's application for sequestration in this case. This was error.

### B.

As a general rule, however, not only must there be an abuse of discretion when that is the scope of review, but a defendant must show that the error actually had a prejudicial effect in order to constitute reversible error. *Jenkins v. State*, Del. Supr., 413 A.2d 874 (1980). But that rule is not without exception:

In certain circumstances, possible prejudice to a defendant may be sufficient when an abuse of discretion has oc-

curred. Such circumstances may exist when the Trial Judge (1) had prudential reason to expect some publicity or incident that might taint a juror, but took no effective action to avoid it; and/or (2) subsequently neglected to take remedial steps to investigate and make a record, suitable for a review on appeal, of the possible effect on defendant's right to a fair trial that may have resulted from the discretionary abuse.[18] *Smith v. State*, Del.Supr., 317 A.2d 20, 23 (1974). "The failure to do so [denies the defendant] any chance to show actual prejudice." *Commonwealth v. Bruno*, Pa. Supr., 466 Pa. 245, 352 A.2d 40, 51 (1976).

Here, there was (1) an abuse of discretion in failing to sequester the jury after delib-

---

18. In this case, the Philadelphia Inquirer article of February 10, referred to above, contained not only the improper public statements of the prosecutor there set forth, but also the following:

> "The police had already employed legal subterfuges to corner Hughes. They tried to trick him into thinking that he had blood on him shortly after the murder and they attached a tape recorder to his mother-in-law, Mrs. Bell, so that she could secretly record a conversation she had with Hughes in 1977.
>
> Mrs. Bell, who has attended every day of the trial with her husband, Robert, a gray-haired, taciturn carpenter, willingly assisted the police.
>
> 'We know Bob killed her—what we don't know is why.' Mrs. Bell said matter-of-factly. 'My nightmare started in the fall of '75 and it'll never end. When you lose a child the way we lost her, it's with you night and day. You even dream of it.'"

Upon resumption on Monday morning, and while the jury was still deliberating, defense counsel informed the Trial Judge of the Philadelphia Inquirer article and requested curative instructions. The Trial Judge's reaction was the following:

> "THE COURT: Bring the jury in.
> (The jury enters the courtroom).
> THE COURT: Ladies and gentlemen, you will remember the Court's instructions about discussing the case or reading or listening to any news accounts of it.
> You all understand, I hope, that discussion of the case includes members of your family, including your spouses.
> I want to ask if any member of the jury, over the weekend recess or at any other time, has violated the Court's instructions about discussing the case or heard or read any news accounts of it in any way?
> Let the record show there has been no response. A negative response.

> You may take the jury back.
> (The jury leaves the courtroom for further deliberations.)
> THE COURT: Now, I understand that the defense has some objection to certain matters contained in certain newspaper articles over the weekend. You do not need to state what you object to. Just give the date and the paper the article is in. That will protect you on the record.
>
> \* \* \* \* \* \*
>
> THE COURT: The article you referred to appeared in the Philadelphia Inquirer on Sunday, February 10th.
> MR. HOLLAND: Yes, sir.
> THE COURT: Your comment is to certain matters that have been alluded to by the prosecution.
> MR. HOLLAND: That's correct and also other witnesses in the case made comments that were not made at the trial that were prejudicial to the defendant.
> THE COURT: You are protected by the record whether I give any instructions or not. I am not sure. I will think about it.
> Anything further?
> MR. HOLLAND: Not at this time, Your Honor.
> THE COURT: We will stand in recess.
> (A recess was here taken.)" (Tr. 1520–1)

Although the subject of prejudice, arising from the failure to sequester the jury and the consequent exposure to the newspaper article, was pressed upon motion for new trial, the Trial Court made no further inquiry into the actual prejudicial effect upon the jury, or the probability thereof. And this despite a news article in the record (Delaware State News, 2/12/80) indicating that when the jury had separated for the week-end, at least three jurors remained undecided as to the proper verdict.

erations had begun, and (2) it was compounded when the Trial Judge did not make an adequate inquiry as to possible exposure of the jurors to news accounts. But, given our conclusion as to other errors at trial, we need not determine whether these errors amount to an independent basis for reversal.

\* \* \*

Reversed and remanded for proceedings consistent herewith.

McNEILLY, Justice (concurring):

Although my overview of the blood and lies issues differs from that of the majority, I find the prosecutor's rebuttal summation to the jury on the blood issue troublesome and not unlikely to have caused prejudice to the defendant. I also agree that the comments by the prosecutor about defendant's courtroom demeanor were improper, as was the prosecutorial characterization of the two year investigation prior to defendant's arrest. Therefore, I am impelled to agree that the cumulative effect of the prosecution's conduct calls for a speedy retrial. I concur in that result.