# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
                               )
             Plaintiff,      )
                               )
                               )
v.                              )      Cr. ID. No. 1307021270A
                               )
                               )
                               )
KYRAN R. JONES,        )
                               )
             Defendant.      )

Date Submitted: March 9, 2017
Date decided: June 5, 2017

## COMMISSIONER'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF

Brian J. Robertson, Esquire, Deputy Attorney General, Delaware Department of Justice, 820 N. French St. 7th Floor, Criminal Division, Wilmington, Delaware, 19801, Attorney for the State.

Patrick J. Collins, Esquire, Collins & Associates, 716 North Tatnall Street, Suite 300, Wilmington, Delaware 19801, Attorney for the Defendant.

**MANNING, Commissioner**

This 5th day of June 2017, upon consideration of defendant Kyran Jones's amended motion for postconviction relief, I find the following:

## Procedural History

On October 14, 2013, Jones was indicted on the following charges: Attempted Murder Fist Degree, Attempted Robbery First Degree, Possession of a Firearm During the Commission of a Felony (two counts) and Possession of a Deadly Weapon by a Person Prohibited. Prior to trial, the possession of a deadly weapon by a person prohibited charge was severed and then later dropped as part of a guilty plea in an unrelated case.[1]

Following a four day jury trial, Jones was found guilty of the lesser-included offenses of Assault in the First Degree, Attempted Robbery in the First Degree and two counts of Possession of a Firearm During the Commission of a felony. Prior to sentencing, Rule 61 Counsel entered his appearance on behalf of Jones. On February 20, 2015, Jones was sentenced to 11 years of unsuspended Level Five time, followed by decreasing levels of probation.

Jones appealed his conviction to the Delaware Supreme Court which affirmed his convictions on November 10, 2015.[2] On appeal, Jones argued two issues. First, Jones argued that a statement made by the prosecutor during closing

---

[1] Cr. I.D. #1308004537.

[2] *Jones v. State*, 127 A.3d 1170 (Table) (Del. 2015).

arguments was not supported by the record and amounted to prosecutorial misconduct that was unduly prejudicial. Utilizing the test established in *Hughes v. State*,[3] the Supreme Court held that it was "not a close case" and that the prosecutor's remarks, although improper, did not prejudice Jones or result in an unfair trial.

Second, Jones argued on appeal that testimony about prior drug sales between Mayne and Jones was improper and should have been excluded as impermissible "bad act" evidence. The Supreme Court held that because this issue was not raised at trial it had not been preserved for appeal. Nevertheless, the Supreme Court analyzed the issue and held that even if Jones had objected, the evidence was properly admissible to show identity.

On February 23, 2016, Jones filed a *pro se* motion for postconviction relief. Pursuant to Superior Court Criminal Rule 62, Jones's motion was referred to the undersigned Commissioner. Jones was subsequently appointed counsel who filed an amended and superseding motion for postconviction relief (the "Motion") on August 31, 2016. Trial Counsel filed an Affidavit on December 6, 2016. The State filed its Response on January 10, 2017. Jones filed his Reply on February 9, 2017.

---

[3] 437 A.2d 559 (Del. 1981).

Based upon my review of Jones's Motion, the trial transcripts and the Delaware Supreme Court decision affirming his conviction, I do not see the need for an evidentiary hearing. In my opinion, the arguments made by Jones in his Motion can be determined with the factual record created at trial. Jones's claims for postconviction relief are:

Ground one: Trial Counsel provided ineffective assistance by failing to call Charlie Thompson as a witness; his testimony would likely have established reasonable doubt that Mr. Jones was the shooter.

Ground two: The prosecutorial misconduct analysis changes when trial counsel's failure to call Charlie Thompson is considered.

## Facts Adduced at Trial

On July 25, 2013, Raymond Mayne and his friend Ray Vandam, known as "Peewee," drove to a church parking lot in the Riverside neighborhood of Wilmington to buy heroin from Jones.[4] Peewee was the driver. Mayne had prior dealings with Jones, who he knew as "Lo," all related to the drug trade. At trial, the State introduced evidence that Jones maintained a Facebook page under the name "Lo Lamotte" with the same date of birth as his.

Shortly prior to the shooting, Jones and Mayne had been communicating by mobile phone to arrange the transaction. The pair made contact with Jones while in the car in the parking lot. Mayne examined the product as he sat in the passenger

---

[4] The facts of this case, which are not materially disputed by the parties for purposes of the pending Motion, were drawn from the Delaware Supreme Court's decision affirming Jones' conviction and the trial transcripts.

3

seat of Peewee's car. Dissatisfied with the quality of heroin Jones showed him, Mayne asked for a different variety. Jones assured him that he had the type of heroin that Mayne wanted, but would have to go around the corner to get it. The would-be purchasers waited in the car. The time was approximately 8:26 a.m. When Jones returned, he pointed a handgun at Mayne and demanded his money. Mayne grabbed the gun, and a struggle ensued. Jones fired several shots. Peewee accelerated at that point, and the two made their escape. As they drove away, Mayne realized he had been shot. They made it to the hospital, where Mayne was treated and eventually recovered. At the hospital, Mayne identified Jones as the shooter in a photo array, stating: "I'm not, now I can't be positive, but you know, if anybody looks like him, it's [Jones's picture]. But that looks like it would be a very, very old picture."

Wilmington police subsequently searched the area where the shooting occurred, locating three spent shell casings on the ground. The car Mayne and Peewee were in was found to have three bullet holes in it, two in the windshield and one in the hood.

On April 18, 2014, six months prior to trial, the State disclosed to the defense that a .380 caliber handgun, that ballistically matched the spent shell casings found at the scene of the shooting, had been located. Coincidently, the handgun was found on July 25, 2013, as part of a probation search of Charlie

4

Thompson's residence at 2409 North Tatnall Street in Wilmington. Probation had searched Thompson's house around 7:00 p.m that evening. During an interview with police on April 10, 2014, Thompson denied that the gun could have been used in a shooting on July 15, 2013, because the gun was with him at his residence all day until located by police. Thompson also denied lending the gun to anyone. The police report reflects that Thompson told police that "he did not know anything about the shooting and even if he did have information about the shooting he wouldn't tell anyway."

At trial, Mayne was never asked by the State to make an in-court identification of Jones. The State, via Det. Nowell, introduced the prior out of court statement of Mayne pursuant to 11 *Del. C.* § 3507. Additionally, Det. Nowell testified that Mayne identified Jones in the photo array as the shooter, but that the photo used in the array was three years old, dating to when Jones was 14 years old. On cross-examination, it was elicited that Peewee told Det. Nowell that a different person in the photo array looked similar to the shooter.

When Jones was arrested, he was in possession of a mobile phone. Using that phone's number, the State introduced evidence of phone calls between that phone and Mayne's phone immediately prior to the shooting. Additionally, the State introduced evidence, established using cell tower sites, that Jones's phone

was present in the same general area was and used to make calls shortly prior to the shooting.

## Legal Standard

To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged *Strickland* test by showing: (1) counsel performed at a level "below an objective standard of reasonableness" and (2) the deficient performance prejudiced the defense.[5] The first prong requires the defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent, while the second prong requires the defendant to show that there is a reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the proceedings would have been different.[6]

When a court examines a claim of ineffective assistance of counsel, it may address either prong first; where one prong is not met, the claim may be rejected without contemplating the other prong.[7] Mere allegations of ineffectiveness will not suffice; instead, a defendant must make and substantiate concrete allegations of actual prejudice.[8] An error by defense counsel, even if professionally unreasonable,

---

[5] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

[6] *Id.*

[7] *Id.* at 697.

[8] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

6

does not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[9]

In considering post-trial attacks on counsel, *Strickland* cautions that trial counsel's performance should be reviewed from his or her perspective at the time the decisions were being made.[10] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting efforts of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[11]

The procedural requirements of Superior Court Criminal Rule 61 must be addressed before considering the merits of any argument.[12] Jones's Motion was timely filed, is not repetitive and neither of his arguments were previously adjudicated in any forum. Therefore, Jones's Motion is not procedurally barred so I will address each claim on its merits.

## Ground One:  Failure to call Charlie Thompson

At trial, neither side called Thompson as a witness. However, Trial Counsel did attempt to use this evidence to raise a reasonable doubt as to who the shooter was. Trial Counsel called the Chief Investigating Officer as a witness and on

---

[9] *Strickland*, 466 U.S. at 691.

[10] *Id.*

[11] *Id.*

[12] *See Younger*, 580 A.2d at 554.

direct examination elicited from him that Charlie Thompson was, like Jones, a black male. Obviously, this fact would have then allowed Trial Counsel to make the argument that Thompson was the real shooter and Jones was misidentified by Mayne. Considering that the actual gun *used* was found in Thompson's possession later that same day, it would have been a strong argument that obviated the need to call Thompson as a witness, avoiding all the attendant pitfalls that might have entailed.

However, the State was apparently ready for this tactic. On re-direct, the State admitted into evidence a photograph of Thompson as of the day of the shooting establishing that he was an older dark-skinned black male with a full bead. Trial Counsel notes in his Affidavit that Jones, who was only 17, did not have a beard when he was arrested several weeks later. Trial Counsel also states in his Affidavit that he considered calling Thompson as a witness, but rejected the idea for a number of reasons.

In his Reply, Jones argues that "there was no downside, and plenty of upside to putting Thompson on the stand as a defense witness." Jones outlines three possible scenarios that might have played-out. The only one that would have changed anything, the first, is if "Thompson admits that he shot Mayne." Although this would certainly have helped Jones, it is just wishful thinking. There is no evidence or reason to believe that Thompson would have had such an attack

8

of conscience that he decided to confess to attempted murder and exculpate Jones. The State had already prosecuted Thompson for being in possession of the firearm for which he was serving a jail sentence at the time of the trial. Thompson would have had no reason to think the State would not have also prosecuted him for the shooting in this case. In fact, it is just as possible that Thompson might have changed his story to *inculpate* Jones by testifying that Jones dumped the gun at his house later that day, telling him that it was "hot"—or something similar.[13] Either way, it is all speculation.

It is my opinion that Trial Counsel made a reasonable attempt to use Thompson as best he could to create reasonable doubt. Considering that Thompson had previously denied any knowledge of the shooting, no reasonable defense strategy would have been served by allowing the jury to hear him—in all likelihood—say that again in their presence. Trial Counsel did not have to prove Thompson was the shooter; only raise it as a reasonable doubt—which he tried to do. Clearly, Trial Counsel had to walk a fine line in how best to use Thompson without inadvertently making the case against Jones stronger. The fact that the State was ultimately able to undermine Trial Counsel's attack was just good lawyering. As I see it, nothing Trial Counsel did, or failed to do, fell below an objective standard of reasonableness.

---

[13] In fact, at trial, Det. Nowell testified that after a shooting, typically "guns are immediately handed off or passed on or discarded, thrown away."

## Ground Two: Prosecutorial Misconduct Analysis

In his Motion, Jones somewhat chafes against the Delaware Supreme Court's ruling upholding Jones's conviction. Jones recognizes, however, that he cannot re-litigate the issues decided there in this forum, but asks the Court to consider them for context in light of his arguments.

Jones argues that "[i]f Charlie Thompson had testified, this is a closer case." Jones asserts that the prosecutorial misconduct analysis under *Huges* would then have gone in Jones's favor—resulting in a new trial. Jones argues that the Supreme Court's ability to review the record was limited by Trial Counsel's deficient performance. Jones also notes that Thompson is not even mentioned in the Supreme Court's Order—which is true.

I must credit Jones for his novel and crafty argument; however, I am not persuaded. Jones's argument, in essence, is based on the flawed notion that had Trial Counsel called Thompson to the witness stand he would have *unquestionably* offered some type of evidence exculpatory to Jones—making the case far less "close." However, there is simply nothing in the record to support that assertion. Because of this lack of evidence, I cannot concur with Jones's argument that "it is reasonably likely that the Supreme Court would have come to a different conclusion in its *Hughes* analysis." As discussed previously, Thompson was a bit

of a wildcard for both sides. Nevertheless, Trial Counsel attempted to make the best possible use of Thompson as he could under the circumstances.

## Conclusion

Trial Counsel's actions were professionally reasonable and did not constitute ineffective assistance of counsel nor prejudice Jones's trial. Accordingly, Jones's Motion should be DENIED.

**IT IS SO RECOMMENDED.**

Bradley V. Manning,
Commissioner


oc:   Prothonotary
cc:   Counsel via email.